AO-91
Rev. 11/82

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br><br>v.<br><br>GERALD HUNTER,<br>MICHAEL BLACKWELL,<br>CHARLES ERIK DORSEY,<br>JULIUS TURRENTINE,<br>JACQUELYN COOPER,<br>RICKY LEE BLACK | **DOCKET NO.**<br><br>**MAGISTRATE'S CASE NO.**<br>97-<br><br>FILED<br>MAR 11 1997<br>CLERK, U.S. DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY<br><br>97-528 M |

Complaint for violation of Title 21, United States Code, Sections 846 and 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br><br>BRIAN Q. ROBBINS | OFFICIAL TITLE<br><br>UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>LOS ANGELES, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>FEBRUARY 20, 1997 | PLACE OF OFFENSE<br><br>LOS ANGELES COUNTY,<br>CALIFORNIA | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### SEE ATTACHMENT I

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>RANDAL HECHT |
|---|---|
| | OFFICIAL TITLE<br><br>DEA TASK FORCE OFFICER |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>BRIAN Q. ROBBINS | DATE<br><br>MARCH 11, 1997 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

PWM:bap

REC: DETENTION ALL DEFENDANTS
ARREST WARRANTS FOR ALL DEFENDANTS



ENTER ON ICMS
MAR 27 1997

ATTACHMENT I

## COUNT ONE

Beginning on a date unknown and continuing to on or about February 20, 1997, in Los Angeles County, within the Central District of California, defendants GERALD HUNTER, MICHAEL BLACKWELL, CHARLES ERIK DORSEY, JULIUS TURRENTINE, JACQUELYN COOPER, and RICKY LEE BLACK, knowingly and willfully conspired and agreed to commit offenses against the United States, namely, to possess with intent to distribute and to distribute, in excess of five kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

## COUNT TWO

On or about February 20, 1997, in Los Angeles County, within the Central District of California, defendants GERALD HUNTER, MICHAEL BLACKWELL, CHARLES ERIK DORSEY, JULIUS TURRENTINE, JACQUELYN COOPER, and RICKY LEE BLACK, knowingly and intentionally possessed with intent to distribute more than five kilograms of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## COUNT THREE

On or about January 21, 1997, in the Central District of California, defendants GERALD HUNTER and MICHAEL BLACKWELL, knowingly and intentionally possessed with intent to distribute more than five kilograms of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

## AFFIDAVIT OF RANDAL HECHT

I, Randal Hecht, hereby swear and affirm as follows:

1.   I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, that is, an officer of the United States who is empowered by the law to conduct investigations of and to make arrests for the offenses enumerated in Section 2516 of Title 18 of the United States Code.

2.   I am a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I have been a Riverside Police Officer for thirteen years. I have participated in numerous long-term investigations involving major narcotic traffickers. I have also received both formal training and on the job training about the methods employed by major narcotic traffickers.

3.   The information in this affidavit has become known to me through my personal investigation or through communications and reports from other agents of the DEA.

4.   This affidavit is in support of a criminal complaint and the issuance of arrests warrants and search warrants as listed below.

## CRIMINAL COMPLAINT AND ARREST WARRANTS

5.   I believe that probable cause exists for the issuance of arrest warrants for the following individuals:

   a.   Gerald HUNTER, aka G, aka Geek, described as a male black, 5'10" tall, 150 lbs., with black hair and hazel eyes.  DOB: 12-08-65.

> b.  Michael BLACKWELL, aka Little M, aka B, described as a male black, 5'10" tall, 200 lbs., with brown hair and brown eyes.  DOB: 04-02-68.
>
> c.  Charles Erik DORSEY, aka E, aka Muddy, described as a male black, 5'11" tall, and 150 lbs., with black hair and brown eyes.  DOB: 05-11-66.
>
> d.  Julius TURRENTINE, aka Jason Fear, aka Turp, described as a male black, 6'0" tall and 290 lbs., with black hair and brown eyes.  DOB: 11-13-64.
>
> e.  Jacquelyn COOPER, aka Jackie, described as a female black, 5'4" tall, and 125 lbs., with brown hair and brown eyes.  DOB: 12-27-63.
>
> f.  Ricky Lee BLACK, aka Richard, described as a white male, 6"0" tall, 180 lbs., with brown hair and brown eyes.  DOB: 09-10-55.

## SEARCH WARRANTS

6.  I believe that probable cause exists to search the following residences and all attached and unattached rooms, attics, basements, garages and storage areas, safes, lockers, briefcases, containers, trash areas, surrounding grounds and outbuildings assigned to or part of the particular residence. In addition, based on surveillance and wire interception, I believe that probable cause exists to search the following locations:

> a.  2505 Second Avenue, Los Angles, California.
>
> b.  3652 Carmona Avenue, Apartment #5, Los Angles, California.

2

c.  553 South St. Andrews Place, Apartment #409, Los Angeles, California.

d.  612 South Cochran Avenue, Apartment #308, Los Angeles, California.

e.  1929 West 146th Street, #9, Gardena, California.

f.  15327 South Ainsworth Street, Los Angeles, California.

g.  8650 Gulana Avenue, Building L, Apartment #3164, Playa Del Rey, California.

h.  1311 West 130th Street, Space #8, Gardena, California.

i.  2555 Sixth Avenue, Los Angeles, California.

j.  8725 ½ Holmes Avenue, Walnut Park, County of Los Angeles, California.

k.  8665 Burton Way, Apartment #419, Los Angeles, California.

l.  21353 Shakespeare Court, Moreno Valley, California.

---

Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause for the issuance of a criminal complaint, arrest warrants and search warrants, I have not described all of the relevant facts and circumstances of which I am aware. In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated. Facts not stated in

3

this affidavit are not being relied upon to reach my conclusion that a criminal complaint and arrest and search warrants should be issued.

Each of the descriptions of locations listed for search warrants have been provided to me by agents and officers of the Southern California Drug Task Force ("SCDTF") who personally observed each location.

**DESCRIPTION OF ITEMS TO BE SEIZED**

7.   Based on my training and experience, and in light of the ongoing drug trafficking business conducted by Gerald HUNTER, Michael BLACKWELL, Charles Erik DORSEY, Julius TURRENTINE, Jacquelyn COOPER, and Ricky Lee BLACK, and other workers/stash keepers and/or narcotics customers, I have probable cause to believe that evidence of violations of 21 U.S.C. §§ 846, 841(a)(1) and 843(b), will be located at the residences described in Paragraph Six above. The description of the items to be seized is as follows:

a.   Narcotics drugs and controlled substances, namely, cocaine and cocaine residue, drug paraphernalia, scales, measuring devices, weighing devices, cutting agents and narcotics packaging materials;

b.   Currency derived from the sale of controlled substances;

c.   Money counting machines, telephone paging devices and beepers and the contents thereof, namely, their memory and test activations by law enforcement, and portable cellular

4

telephones, and mobile telephones, and the contents thereof, namely, their memory and test activations by law enforcement, police scanners, radio frequency detectors, telephone recording and answering devices and the contents thereof, namely, recorded telephone messages, and communication devices which evidence participation in a conspiracy to distribute narcotic drug controlled substances;

d. Handguns, shotguns, firearms and weapons which may be used to facilitate the distribution of, or possession with intent to distribute, controlled substances; and

e. For the period of time from January 1, 1996, to the present, narcotics ledgers, money ledgers, distribution or customer lists, supplier lists, correspondence, notations, logs, receipts, journals, books, records and documents noting price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed;

f. For the period of time from January 1, 1996, to the present, personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, communications, and personal notes and items reflecting names, identity, addresses, and telephone numbers, regarding the identity of associates involved in drug trafficking activities;

g. For the period of time from January 1, 1996, to the present, financial instruments purchased with large amounts of currency derived from the sale of controlled substances, namely, travelers checks, bonds, stock certificates, cashier's

5

checks, and certificates of deposit;

h.    For the period of time from January 1, 1996, to
the present, bank account records, wire transfer records, bank
statements, safe deposit box keys and records, money containers,
financial records, and notes showing payment, receipt,
concealment, transfer, or movement of money generated from the
sale of narcotics;

i.    For the period of time from January 1, 1996, to
the present, records, items, and documents reflecting travel for
the purpose of participating in narcotic trafficking, namely,
airline tickets, credit card receipts, travel vouchers, hotel and
restaurant receipts, cancelled checks, maps and written
directions to locations;

j.    For the period of time from January 1, 1996, to
the present, records, documents and deeds reflecting the purchase
or lease of real estate, vehicles, precious metals, jewelry, or
other items obtained with the proceeds from the sales of narcotic
drug controlled substances;

k.    For the period of time from January 1, 1996, to
the present, indicia of occupancy, residency or ownership of the
premises, namely, utility bills, telephone bills, loan payment
receipts, rent receipts, trust deeds, lease or rental agreements,
and escrow documents.

8.    I have experience, training, and communications with
law enforcement personnel who specialize in the area of
documentation and detection of proceeds from drug trafficking.

6

I have experience in debriefing defendants and informants as witnesses who have personal knowledge of drug trafficking organizations. Such individuals often have personal information as to the transportation and distribution of the drugs and money in large scale controlled substance distribution operations. Such information includes:

a.      That drug traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of cocaine, money, and/or other drug related assets are stored. Therefore, one or more locations are often used to store lesser amounts of narcotics, money, and/or drug related assets, and additional locations are used to meet customers and/or are used as "safe-houses;"

b.      That persons involved in large scale drug trafficking organizations conceal, in various locations, caches of drugs, drug paraphernalia, amounts of jewelry, automobiles, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting or spending large sums of money acquired from engaging in narcotics trafficking activities;

c.      That drug traffickers permanently maintain at their locations, including the residences where they live, money ledgers, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents

7

noting the price, quantity, and/or times when narcotics were obtained, transferred, sold, distributed, and/or concealed; that drug traffickers also maintain drug paraphernalia such as "cutting" materials, weighing devices, miscellaneous containers, and measuring devices which are used to facilitate the distribution of narcotics; and that these items are maintained and kept by the narcotics trafficker in much the same way legitimate businesses will maintain their "tools of the trade," whether or not there is contraband on the premises on a given day;

d. That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, traveller's checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes;

e. That drug traffickers often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement agencies; and that even though these assets are in other persons' names, the drug dealers retain records, documents, and deeds reflecting the purchase of those assets while continuing to use those assets and exercise dominion and control over them;

f. That it is common practice for large scale narcotic traffickers to travel to their purchase and distribution

8

areas to facilitate their trafficking; that after purchasing drugs, narcotic traffickers will transport or cause to be transported cocaine to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, rental and private automobiles, and government and contract mail carriers;

g. That drug traffickers use telephones, portable cellular telephones, pagers and other communication devices and maintain telephone and address books, telephone bills and other books and papers which reflect names, addresses, and/or telephone numbers of their associates in the narcotic trafficking organization and customers of narcotics;

h. That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product; and that these traffickers usually maintain these photographs at their premises;

i. That drug traffickers commonly have in their possession, that is on their persons, at their residence and/or at their stash houses, firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, that are used to protect and secure the drug trafficker's property, including narcotics, narcotic paraphernalia, currency, jewelry, and records.

9. During the intercepted conversations, HUNTER and others used cryptic or coded language to discuss narcotics trafficking over the telephone. Through training and experience, I have

9

determined that many of the terms used describe narcotics. For example, some of the terms used by Hunter and others to describe cocaine and currency included "chips," "videos," "CD's," "white levis," "levis," "black levis," "change," "tacos," "tapes," "that," and "extras."

10. The following are the contents of some of the conversations monitored by agents/officers during the wiretap. I selected these particular conversations to demonstrate the scope of HUNTER's drug trafficking organization and the identity of some of the co-conspirators in that organization. The listed conversations are not exhaustive of all of the pertinent conversations intercepted during the wiretap.

**PROBABLE CAUSE**

11. The information contained in this affidavit is based upon information that other agents/officers and I have developed through the use of a court-authorized wire interception, and information obtained through surveillance of the individuals identified in this affidavit. Agents/officers have identified a narcotics trafficking organization headed by Gerald HUNTER. Agents/officers have identified the following co-conspirators: Michael BLACKWELL, Charles Erik DORSEY, Julius TURRENTINE, Jacquelyn COOPER, Ricky Lee BLACK, Michael PARKS, Thomas MADISON, Anthony Donell JACKSON, and Marcus LNU aka GANGSTER. The above co-conspirators are distributors, "stash keepers" and facilitators of the HUNTER cocaine trafficking organization. The identities of the suspects were ascertained through a variety

10

of methods. Some of these methods included names used by the speakers themselves during intercepted conversations, and surveillance activity revealing that a co-conspirator was at a particular location being called by one of the individuals intercepted. Observations were made, with respect to each subject, on occasions when the subjects were doing things consistent with what they had discussed during intercepted conversations. By listening to the conversations, verbally identifying the participants in the conversations, and then conducting surveillance in the areas where it was believed the conversants were located, the agents/officers were able identify the participants in the conversation visually and, therefore, the participants in the narcotics trafficking conspiracy.

12. The identities of the following individuals were corroborated through photographs obtained from the California Department of Motor Vehicles ("DMV"): Gerald HUNTER, Anthony JACKSON, Thomas MADISON, Michael PARKS, Julius TURRENTINE, Jacquelyn COOPER, Ricky Lee BLACK, Michael BLACKWELL, and Charles Erik DORSEY.

13. On January 8, 1997, S/A Joseph Geraci told me the following:

a. On January 8, 1997, at approximately 5:30 a.m., surveillance was established near an apartment located at 553 South St. Andrews Place, Apt. #409, Los Angeles, California. The telephone number listed at this residence, (213) 365-1380, is subscribed to by Jacquelyn COOPER. HUNTER's cellular telephone

11

records show that this was a frequently called telephone number.
COOPER also listed this address on her California driver's
license.

      b.    At approximately 10:35 a.m., TFO Myers observed
a Gold Lexus, bearing California license number 3JVB734 (R/O
Jacquelyn COOPER, 5175 Flora Avenue, Montclair, California), and
a black Toyota Landcruiser with paper license plates, leave the
apartment complex and go to the UNOCAL gas station located at the
intersection of Manhattan Place and Sixth Street.

      c.    After arriving at the gas station, S/A Geraci
observed HUNTER exit the black Landcruiser and COOPER exit the
gold Lexus.  S/A Geraci observed HUNTER and COOPER talking with
each other.

      d.    At approximately 10:40 a.m., TFO Myers observed
both suspects enter their respective vehicles and leave the area
in separate directions.

      e.    At approximately 10:43 a.m., TFO Richardson
observed HUNTER using a cellular telephone for approximately
one minute.  S/A Craig Wiles reviewed pen register information
on HUNTER's cellular telephone number (310) 749-0559.  At
approximately the same time, this cellular telephone called
(213) 737-5908.  The Pacific Bell telephone company lists the
subscriber of telephone number (310) 737-5908 as Monica
Houlemand, 2555 Sixth Avenue, Los Angeles, California.

      f.    At approximately 10:50 a.m., TFO Shorb observed
HUNTER arrive at 2555 Sixth Avenue, Los Angeles, California.

12

TFO Shorb observed HUNTER exit the Landcruiser carrying two gift wrapped packages, and enter the residence.  At approximately 11:05 a.m., TFO Myers observed HUNTER leave the location, again driving the Landcruiser.

       g.   Police records indicate that Thomas Duwayne MADISON lists his address as 2555 Sixth Avenue, Los Angeles, California, and his telephone number as (213) 737-5908.  Police records also indicate that MADISON has received traffic citations while driving a vehicle registered to HUNTER, and that HUNTER has received traffic citations while driving a vehicle registered to MADISON.

    14.  On January 14, 1997, the Honorable Harry L. Hupp signed an order in Misc. No. 31347 authorizing the interception of wire communications to and from cellular telephone number (310) 749-0559, electronic serial number D5766701, subscribed to by Jacquelyn COOPER, P.O. Box 761242, Los Angeles, California.

    15.  Set forth below is a summary of pertinent intercepted conversations which occurred on (310) 749-0559, the cellular telephone used by Gerald HUNTER.  The conversations intercepted were in English.  The speakers have been identified by subscriber information, surveillance, voice identification by officers who have compared voices, or by the speakers' own identification of themselves.  Your affiant reviewed the following intercepted communications:

**JANUARY 14, 1997**

    16.  At approximately 6:49 p.m., an outgoing call was placed

13

on HUNTER's cellular telephone to (213) 507-6246 (subscribed to
by A-Tel, Inc., Downey, California). During the conversation, an
unidentified hispanic male ("UHM") asked BLACKWELL how much was
he taking to him. BLACKWELL said he was taking him 12. The UHM
asked if he had any more. BLACKWELL said he had 15. The UHM
said okay. BLACKWELL asked if that was what it was supposed
to be. The UHM said he was missing six, but three for now.
BLACKWELL said the bag was sitting in the back seat, but he was
going to check and then call the UHM back.

17. Based on this conversation, I believe that BLACKWELL
was using HUNTER's cellular telephone to discuss a cocaine
transaction in which BLACKWELL told an UHM that he was taking him
12 kilograms of cocaine. The UHM asked BLACKWELL if he had any
more and BLACKWELL said he had 15 kilograms.

**JANUARY 16, 1997**

18. At approximately 12:03 a.m., an outgoing call was
placed from HUNTER's cellular telephone to cellular telephone
(310) 710-3021, subscribed to by Michael BLACKWELL, 15327
Ainsworth Street, Gardena, California. During the conversation,
HUNTER told BLACKWELL he could call an UM from there to see
whether the UM was going to come through. HUNTER told BLACKWELL
he talked to "Angelo" and that "Angelo" asked for more.
BLACKWELL said he would get the UM some "shirts" and pay the UM
for his expenses out of that for today. HUNTER asked how much
BLACKWELL had to give the UM. BLACKWELL replied what he had told
HUNTER: 25 and that one for expenses.

14

19.  Based on this conversation, I believe that BLACKWELL
delivered 26 kilograms of cocaine to "Angelo."

**JANUARY 18, 1997**

20.  At approximately 3:31 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, PARKS asked HUNTER if he still had the same ones.
PARKS told HUNTER it was going to be 21 all together, but it was
going to be 11 within an hour.  HUNTER said okay, and then asked
if PARKS wanted to meet within an hour at the same location.
PARKS said no.  HUNTER said that he would meet him over there
within an hour, and that most likely he was going to leave him
"the whole 2-1."  PARKS said okay, and added that "they" were
going to come right back once "they" do their ten.

21.  Based on this conversation, I believe that PARKS told
HUNTER that he needed a total of 21 kilograms of cocaine, and
that he needed 11 within the hour. HUNTER asked PARKS where he
wanted to meet because he was going to give him the whole 21.
PARKS said he had a customer who was going to order more cocaine
once he sold the ten.

**JANUARY 19, 1997**

22.  At approximately 2:13 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, PARKS asked HUNTER asked if "he" had called.
HUNTER said no, and added he was waiting for the guy to respond.
HUNTER then mentioned that he told "him" that the best HUNTER
could do was if "he" got 2-0 and over, HUNTER would take two off,

15

but anything less than that, he could not do that.

**JANUARY 20, 1997**

23.  At approximately 11:36 a.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 710-3021. During the conversation, BLACKWELL asked HUNTER for his whereabouts.  HUNTER said he was headed out to "B's," and added that it was going to be "15 for right now" and more later on. BLACKWELL asked if it was "30 something."  HUNTER said that it should be that.  BLACKWELL said he might have to have like 24.

24.  Based on this conversation, I believe HUNTER told BLACKWELL that he needed 15 kilograms delivered to him now, and more later on. BLACKWELL confirmed that the total count of kilograms was "30 something."

**JANUARY 21, 1997**

25.  At approximately 7:32 a.m., an outgoing call was placed from HUNTER's cellular telephone to the Embassy Suites at (310) 215-1000.  During the conversation, HUNTER asked for Blackwell, Room #823.  HUNTER said he would meet BLACKWELL where they were supposed to be.  HUNTER said that was where he had told BLACKWELL last night, at the same spot.

26.  At approximately 8:05 a.m., an incoming call was received on HUNTER's cellular telephone.  During the conversation, BLACKWELL asked where HUNTER wanted him to go. BLACKWELL asked if he had gotten 20 the last time.  HUNTER said BLACKWELL had gotten 40, and then corrected himself and said it was 20.

16

27. Based on this conversation, I believe that BLACKWELL confirmed that HUNTER wanted 20 kilograms, and asked where HUNTER wanted it delivered.

### SURVEILLANCE OF THE EMBASSY SUITES HOTEL ON JANUARY 21, 1997

28. At approximately 7:00 a.m., surveillance units established surveillance at the Embassy Suites Hotel, 9801 South Airport Boulevard, Los Angeles, California.

29. At approximately 8:10 a.m., surveilling unit Myers observed BLACKWELL exit Room 823 carrying a two small bags. Surveilling units observed BLACKWELL enter a Chevrolet Tahoe, with paper license plates, and drive to a business complex located at 1248 West 134th Street, Unit #7, Los Angeles, California. After losing sight of BLACKWELL for a few minutes, surveilling units observed BLACKWELL exit the business. BLACKWELL walked back to his Tahoe carrying a box that appeared to be very heavy and difficult to handle. Surveilling units observed BLACKWELL place the box in the passenger side of the Tahoe. BLACKWELL re-entered the driver's side and drove out of the parking lot. Surveilling units followed BLACKWELL to 1728 Sterns Drive, Los Angeles, California, where they observed BLACKWELL exit the Tahoe, remove the box and carry it to a gray vehicle. BLACKWELL met an unidentified male ("U/M") who opened the trunk. BLACKWELL placed the box in the trunk and closed it. Surveilling units then observed BLACKWELL and the UM enter the car and drive out of the area. The vehicle made several counter-surveillance maneuvers. Surveilling units followed the car to

17

the garage area of the Del Rio Apartments where surveillance of
the car was lost.

30. On January 22, 1997, I noticed a decline of telephone
calls. I contacted an AirTouch Cellular representative, who
advised me that HUNTER had changed his cellular telephone number
from (310) 749-0559 to (310) 749-4994. I know that narcotics
traffickers frequently change their telephone numbers to thwart
law enforcement. I believe that HUNTER knew that the police were
following him and his associates; I believe that this is why he
changed his telephone number. Since the electronic serial number
(D5766701) remained the same on the cellular telephone used by
HUNTER, law enforcement continued to intercept conversations over
this telephone.

## JANUARY 23, 1997

31. At approximately 12:38 a.m., an outgoing call was
placed from HUNTER's cellular telephone to (213) 365-1380.
During the conversation, HUNTER said that "the guy" had to bail
out of the room where he was staying. HUNTER said "they" were
all over there. HUNTER said "they" walked up to the front desk
and started to ask questions about who was in the room. COOPER
asked if it was a residence. HUNTER said no. HUNTER said they
were trying to find out things.

32. At approximately 5:38 p.m., an outgoing call was placed
from HUNTER's cellular telephone to cellular telephone number
(310) 993-8500, subscribed to by Rick BLACK, 8665 Burton Way,
Unit #419, Los Angeles, California. During the conversation,

18

BLACK asked what HUNTER needed.  HUNTER said he would tell BLACK
in person.  HUNTER said it was like the same thing that they had
talked about before, but that he would tell BLACK in detail when
they met.

33.  On February 10, 1997, S/A Joseph Geraci told me that
BLACK has been investigated for selling vehicles for cash to
narcotics traffickers, and then adding his fee of approximatelly
7% over the cost of the vehicle.  BLACK does this to hide the
cash purchase of the vehicle.  BLACK is also licensed by the
State of California as an automobile reseller.

34.  At approximately 6:38 p.m., an outgoing call was placed
from HUNTER's cellular telephone to (314) 707-8432.  During the
conversation, TURRENTINE said that he did not feel that it was
coming from "here."  HUNTER agreed.  It was either HUNTER or back
from the other way.  HUNTER told TURRENTINE that they had his
I.D., so that they must have run it and found out who it was and
now they are trying to pursue.  TURRENTINE said that he had that
in mind but he was not seeing anything happening over here.
TURRENTINE said that "Ron" is at home all the time and he is at
the spot where they went to.  TURRENTINE asked HUNTER what people
it was; if it was a plane or ... HUNTER informed him that it was
"an under."  HUNTER then said that he agreed that TURRENTINE was
okay, but told him that he would not put anything past these
[guys].  HUNTER said that from what he had seen, 18 to 36 [UI's]
in the sky, and that they were not playing.  HUNTER then said
that he felt the only thing they had ever seen was a bag or a box

19

or something, but not any "trans," not any "action." HUNTER told
TURRENTINE that whatever it might be, whatever they might have
right now, he knew that he was not in any trouble because they
had not come. HUNTER said that he had never been this scared,
that this time they really scared him; it was just too much.
HUNTER said that the thing that they were waiting for is one of
those vehicles to be on the way. HUNTER added that they were
waiting to try and tail somebody all the way back, and then blow
it up the way they want it blown up. TURRENTINE said that what
they want to do is "catch the whole thing." HUNTER agreed.
TURRENTINE said that he had not seen one there, so it could not
be there. TURRENTINE said that what he meant was that it could
be coming from an entirely different thing, or from a lot of
different things. TURRENTINE said that he knew that they had
been over at "B's" place, so that guy was nothing nice. HUNTER
said that he wanted everything new, because he did not know what
they had seen or any of that. TURRENTINE told HUNTER that the
guys that he wanted him to meet were big time, they were no joke.
TURRENTINE said that a long time ago he had told "Mike" that even
though he might not be doing anything, but the people he is with
[UI]. HUNTER said that he would also relay that comment to
"Mike." TURRENTINE told HUNTER that what he wanted to clarify
was that it could be coming from an entirely different sector,
and that it might not have even started with him. HUNTER agreed
that was a possibility. TURRENTINE added that they had already
known "Ron's" for years, and there had not been anyone on that

20

block.  HUNTER said that after that he went to go see "M"
(PARKS), by "B" (BLACKWELL) just to double check.  HUNTER said
that they were there, and so he and "M" had to shake them.
HUNTER said that he had seen too much.  He had his warning and
does not want to be a fool.  HUNTER said that he had been
thinking about that "conspir" (conspiracy), and mentioned that he
did not want to say the whole word.  HUNTER said that he did not
think it could be that, because they would have already had
something, and that they would be happy to get him with just
that.  HUNTER said that would send him.  HUNTER said that he felt
that he was clean so far because they had not scooped him yet.
HUNTER asked if TURRENTINE  felt that if there was any "conspir"
(conspiracy), any talking over the ... if they had been hearing
something, if they would have already gone and picked HUNTER up.
TURRENTINE did not reply immediately.  HUNTER said that "conspir"
(conspiracy) was something serious, so, evidently, it must be
nothing right now.  TURRENTINE agreed, and then advised HUNTER
"not to deal, period."  TURRENTINE said that he spoke to "E"
(DORSEY) and he was saying that HUNTER should just get "Big M"
(PARKS) to do HUNTER's running around for right now, since "Big
M" had been in ...  HUNTER interrupted and told TURRENTINE  that
he did not want to talk too much.  HUNTER said that he would try
that.  HUNTER then said that in reference to what TURRENTINE had
asked him to do this time, he told "E" to do what TURRENTINE had
said this time, and then after that they could go on as they had
said.  TURRENTINE then told HUNTER that his concern was ...

21

TURRENTINE needed that thing out of there, because he did not want that to be tied in. HUNTER said that he would tell "him" to try and get it out of there, but that he and TURRENTINE should never go over there because that thing is lit up; burning off the roof. TURRENTINE said that it could be coming from somebody that "M" knew and took over to the thing.

35. Based on this conversation, I believe that HUNTER and Julius TURRENTINE were planning ways to limit their chances of being arrested for cocaine trafficking. Julius TURRENTINE told HUNTER not to touch the cocaine directly, but that he should let PARKS ("Big M") do the transporting for him.

36. St. Louis DEA SA Murphy later reviewed the above taped conversation to telephone number (314) 707-8432. SA Murphy has contacted Julius TURRENTINE on previous investigations. He recognized the person HUNTER was speaking to as Julius TURRENTINE.

**JANUARY 25, 1997**

37. At approximately 10:02 p.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 652-8500, subscribed to by Black on Black, 200 North Robertson Blvd., #338, Beverly Hills, California. During the conversation, HUNTER asked what was going on. BLACK replied that HUNTER should go check out those Expeditions tomorrow if he wanted. HUNTER agreed, and said he would go see if he liked one. BLACK said that if he wanted that, he should let him know what color he wanted, and they would do it. BLACK said he could have it for him on Monday.

22

38. Based on this conversation, I believe that BLACK was going to purchase a car for HUNTER.

**JANUARY 28, 1997**

39. At approximately 3:37 p.m., an outgoing call was placed on HUNTER's cellular telephone to (213) 365-1380. During the conversation, HUNTER told COOPER that he was going to come over, but that he had "five kids" [PH] first, and he got dropped off right by the apartment, just to see what was going down. HUNTER said he had just told the guy who dropped him off to "check his tracks."

40. Based on my training and experience, I know that narcotics traffickers often use code words during conversations to thwart law enforcement. During the above conversation, I believe that "five kids" was a reference to five kilograms of cocaine.

**JANUARY 31, 1997**

41. At approximately 8:24 a.m., an outgoing call was placed on HUNTER's cellular telephone to (213) 737-5908, subscribed to by Monica Houlemard, 2555 Sixth Avenue, Los Angeles, California. During the conversation, Thomas MADISON said there was a "big bill" coming up, that was all. HUNTER said he would take care of it. MADISON said he appreciated it. HUNTER said he would meet with an UM once he [UI].

42. Based on this conversation, I believe that MADSION told HUNTER that they had to pay for a load of cocaine ("big bill"). HUNTER said he would pay for it.

23

## FEBRUARY 3, 1997

43. At approximately 11:29 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 365-1380. During the conversation, HUNTER asked what was up. COOPER replied that they called her office to say that HUNTER's phone number was cloned. HUNTER said he kind of figured that. COOPER told him they put a restriction for long distance on it, but it had been cloned for a while now. HUNTER asked for about how long. COOPER replied she did not know, that a lady had called her office. HUNTER said he had a feeling it was cloned anyway because of those people. COOPER said it was not because of those people, but because someone got HUNTER's number and then used it; his phone bill was going to be very high, so far probably around a couple of thousand dollars because they dialed long distance calls. HUNTER said he had not been dialing those. COOPER said that was why they wanted her to call right away, to turn the number off. HUNTER said she should have it turned off then. COOPER said he knew how many times his phone had been cloned because [UI]. HUNTER said he just figured it was cloned anyway because just anybody could clone it with a little machine, but that he was thinking that they do that too. HUNTER asked if they said there were out-of-town calls. COOPER replied yes. HUNTER said he saw what she meant. HUNTER told her he was ready. COOPER put him on hold while she placed a three-way call to the phone company. The phone company put COOPER and HUNTER on hold for a while. [THE CALL WAS THEN DISCONNECTED].

24

44.  On February 3, 1997, L.A. Cellular changed the number
on the cellular telephone used by HUNTER from (310) 749-4994 to
(310) 749-4303.  Once again, the electronic serial number
(D5766701) remained the same, so law enforcement continued to
intercept conversations over this telephone.

45.  At approximately 11:21 p.m., an outgoing call was
placed from HUNTER's cellular telephone to cellular telephone
number, (213) 248-4662, subscribed to by Latonya Walker, 536 West
104th Place, Los Angeles, California.  During the conversation,
HUNTER asked BLACKWELL what was up and referred to him as "Big
Head."  BLACKWELL told HUNTER that he could not find the 888
number; he lost it.  BLACKWELL informed HUNTER that he had talked
to BLACK today.  HUNTER asked if BLACKWELL had told him that.
BLACKWELL replied no, because he said he was waiting on HUNTER to
do something over there.  HUNTER said he was dialing him when
BLACKWELL's page came through, but there was no answer.
BLACKWELL said he (BLACK) said he was just waiting for him
(BLACKWELL) to get back from whatchamacallit.  BLACKWELL said he
was going to get foreign [PH] plates and that he was just waiting
for "Erik" (DORSEY).  BLACKWELL said he told him about that
auction and that BLACK said no.  HUNTER replied he stayed because
it was over here.  HUNTER said they were looking at everybody
from afar by the park all the time, the same ones.  HUNTER said
there were two like that because one time he saw them on "B"
(BLACKWELL).  HUNTER added he knew they were on him too.  HUNTER
said he called and told "B" (BLACKWELL) he was slipping.

25

BLACKWELL asked HUNTER for the 888.  HUNTER said it was 220-0576.
BLACKWELL then said he was going to try to make some more with
the material that he had.  HUNTER said yes, and added he told him
he would have to do it that way.  BLACKWELL told HUNTER that he
still had "six or seven tapes."  BLACKWELL said there were only
"19 tapes."  BLACKWELL said minus the [UI] from "Uncle B" made
14.  HUNTER said he wanted to know about the "old tapes."
BLACKWELL asked if HUNTER meant the "old, old clean tapes."
HUNTER replied yes.  BLACKWELL told HUNTER there were "seven
tapes" left with some good music.  HUNTER said they were probably
sold already.  BLACKWELL said he thought HUNTER had already
"taken some music and put it in little cartridges."  HUNTER said
yes.  BLACKWELL said there were two of those.

46.  Based on this conversation, I believe that BLACK was
obtaining a load car for HUNTER. BLACKWELL and DORSEY were
handling the details of obtaining the car through BLACK.
BLACKWELL also told HUNTER that he still had six or seven
kilograms of cocaine with him, and that there were 19 kilograms
left in total. BLACKWELL said that he would only have 14 after
delivering to "Uncle B." BLACKWELL also asked if HUNTER had
broken some of the kilogram cocaine into smaller packaged bags.
HUNTER said yes.

**FEBRUARY 4, 1997**

47.  At approximately 11:26 a.m., an outgoing call was
placed on HUNTER's cellular telephone to (310) 652-8500.  During
the conversation, HUNTER identified the receiver as BLACK, and

asked what was going on. BLACK said he was just laying low.
BLACK then mentioned that HUNTER should go to Hawaii or Mexico
for a couple of months. HUNTER asked if BLACK had spoken with
"Little Mike" (BLACKWELL). BLACK said yesterday. HUNTER said
that "Mike" wanted BLACK to pick it up from his way if he could.
BLACK asked if HUNTER wanted the same year; 92-93. HUNTER said
yes, and added that he was told that BLACK had found something.
BLACK said that his dad had found a 91, and was going to go look
at it, but then DORSEY said he wanted it back here, so BLACK just
blew it off. HUNTER said that could have worked just as long it
was in good condition. BLACK said he could call him back.
HUNTER asked if it was going to be the same kind. BLACK said
yes, and added it was the same model. HUNTER said that would
work. HUNTER then asked if he was going to send somebody to
drive it back. BLACK said yes. BLACK then said he knew of some
good places down in Mexico. HUNTER asked where. BLACK asked if
HUNTER had a passport. HUNTER said no, and added he could not
leave anyway. BLACK asked if HUNTER was still on probation.
HUNTER said yes, but he was off this month. BLACK said HUNTER
could get a passport after he got off of probation. HUNTER
mentioned that he had heard that once he was on parole, he could
never get a passport. BLACK said that was not true, but the only
thing was that HUNTER could never own a gun or get a gun permit
unless he got a pardon. BLACK said that HUNTER could also go
over to the Florida Keys, or Hawaii without a passport. BLACK
said he was going to get to work on the van. HUNTER said okay.

27

48.  Based on this conversation, I believe that BLACK was purchasing a load vehicle for HUNTER'S organization.

49.  At approximately 5:45 p.m., an outgoing call was placed on HUNTER's cellular telephone to (213) 290-5025 (Century 21 Realtors, COOPER's place of employment).  Initially, HUNTER and COOPER engaged in casual conversation.  COOPER then asked HUNTER how come there was a charge on her American Express card for $869.  HUNTER said that was for the gray Toyota car, the rent-a-car.  COOPER told HUNTER he had that car for two weeks.

**FEBRUARY 9, 1997**

50.  At approximately 2:49 p.m., an incoming call was received on HUNTER's cellular telephone.  During the conversation, HUNTER said everything was straight.  BLACKWELL said he had just gotten off the phone with BLACK.  HUNTER asked what BLACKWELL wanted to do.  BLACKWELL said he told BLACK to go ahead, and that BLACK was going to pick it up now.  BLACKWELL said BLACK would have everything done, and asked if BLACK had told HUNTER anything about that.  HUNTER said BLACK had mentioned it to him, but that he was waiting to call BLACKWELL to get the go ahead.  BLACKWELL asked if BLACK had talked to HUNTER about the way he was going to do it.  HUNTER said yes, and that it was going to be done "out there."  BLACKWELL said yes, and said it was there, and they were going to do it "out there," too.  HUNTER asked if they were going to use the girl to bring it in.  BLACKWELL said yes.

51.  Based on this conversation, I believe that this was

28

further discussion about the load car BLACK was putting together. BLACKWELL and HUNTER discussed the car and a load of cocaine being brought in from out of state.

**FEBRUARY 10, 1997**

52.  At approximately 5:25 p.m., an outgoing call was placed on HUNTER's cellular telephone to (310) 993-8500 (Rick BLACK's cellular telephone).  During the conversation, HUNTER asked Rick BLACK what was up.  BLACK replied that he could do this van, and asked if there was any way HUNTER could get to him soon.  HUNTER asked how much was it.  BLACK replied it was "14-7."  HUNTER asked what year was it.  BLACK replied it was a '92.  HUNTER asked what year was the other one.  BLACK replied it was a '92.  HUNTER asked how much that other one was.  BLACK replied it was "14-3," including the registration back there.  HUNTER asked if BLACK talked to "Mike."  BLACK replied yes, and added he had told "Mike" "14-6," but explained that guy wanted $100 dollars more, otherwise he was going to sell it to somebody else.  BLACK stated it was practically brand new.  HUNTER told BLACK to call "E" (Erik DORSEY), and added "E" would be ready for BLACK.  BLACK said he did not know if he had his number there.  HUNTER said he did not know "E's" new number.  BLACK said he did have it. HUNTER asked if BLACK had "E's" 800 pager number.  BLACK replied he had it.  HUNTER asked BLACK to page him with the 800 pager number.  BLACK agreed to do so.

53.  Based on this conversation, I believe BLACK and HUNTER were continuing to finalize negotiations for a load car. HUNTER

29

told BLACK to contact DORSEY who was handling the car details.

**FEBRUARY 11, 1997**

54. At approximately 10:49 a.m., an outgoing call was placed on HUNTER's cellular telephone to (310) 652-8500. During the conversation, HUNTER told BLACK that the guy was going to get the address, and that he would give it to him as soon as he got it. BLACK said he needed the name, address, and title and registration fees. HUNTER asked how much it was. BLACK asked if it was here in California. HUNTER said yes. BLACK said it was "$2,767." BLACK asked how much they had sold it for. HUNTER said he thought it was "22 or 24." BLACK said he thought it was "25." HUNTER agreed. BLACK then apparently divided $25,000 by 10.25%, and said it was "$2,562." HUNTER said he would tell the guy. HUNTER asked how much the ticket was. BLACK said it was $39. HUNTER said the guy had said not to worry about it, and that he would pay for it. BLACK said he was not worried, but that it presented a problem because the car was still registered to him. BLACK said he would never know if the guy had ever received a moving violation and not paid, and they would put a warrant on that car. BLACK told HUNTER to tell the guy to be more careful.

55. Based on this conversation, I believe HUNTER and BLACK were continuing their conversation about a second load car. BLACK confirmed that he said the total price was $25,000. HUNTER agreed. BLACK said he was including his profit, 10.25%, and that he would make $2,562 from the transaction. BLACK also told

30

HUNTER he needed the name and address that the car was to be
registered in.  BLACK also asked HUNTER if he wanted to register
it in California, or out of state.  HUNTER confirmed California.
The two also discussed a parking citation that had been issued to
the car.  BLACK told HUNTER to tell the guy with the car to be
more careful so that there would be no warrants on the car.

**FEBRUARY 12, 1997**

56.  At approximately 12:45 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, GANGSTER (Marcus LNU) said they were over there
getting stuff together.  HUNTER asked if GANGSTER was on the
East.  GANGSTER replied yes.  HUNTER said GANGSTER should bring
it to the West, then said it would probably be unsafe over there.
GANGSTER agreed and said he would rather wait until they went,
because he did not want to take any chances.  HUNTER asked what
about over there on "Palm" [UI].  GANGSTER asked about how long.
HUNTER replied it would not be long, then changed his mind and
said it was kind of crazy out there.   HUNTER asked what GANGSTER
was going to do, and asked him if he did not have two cars.
GANGSTER replied he might be ...  HUNTER interrupted him and
asked if GANGSTER still had that rental car.  GANGSTER replied
no, adding that he had to take it back.  HUNTER said he told
GANGSTER he could have kept it for that week.  GANGSTER said he
did.  HUNTER asked if GANGSTER brought 50 in.  GANGSTER replied
it really came out to about two because of the extra charges per
day.  HUNTER said he was trying to figure out what GANGSTER was

31

going to do with that junk.  HUNTER said he should just take it and lock it up in a car, adding he thought GANGSTER still had the other car, too.  HUNTER stated maybe he and GANGSTER should just do it tonight.  GANGSTER agreed and said they would figure out something.  HUNTER said "he" could not tell GANGSTER what to do with it.  GANGSTER asked [UI].  HUNTER replied yes, adding that what he was saying was that not all of that was going to "him."  HUNTER asked if GANGSTER knew what he was saying.  GANGSTER replied yes, and told HUNTER to let him think.  GANGSTER said HUNTER could come get it.  HUNTER agreed and said they would do that another night because it was too crazy out there right now.  GANGSTER agreed.

57.  Based on this conversation, I believe that HUNTER and GANGSTER were planning what to do with the load of cocaine GANGSTER was putting together for delivery.  HUNTER told GANGSTER he should put it in the trunk of a car somewhere and let it sit.  HUNTER said that he didn't want to pick it up from GANGSTER because there were a lot of police around.  HUNTER said he would get it another night and also told GANGSTER that only part of the load was going to "him" (an unknown subject).

58.  At approximately 2:28 p.m., an outgoing call was placed from HUNTER's cellular telephone to (702) 798-9344.  During the conversation, HUNTER said he was waiting for "the peanut."  HUNTER asked BLACKWELL what happened to those "tapes."  BLACKWELL said the guy was not back.  HUNTER asked if the guy was stuck.  BLACKWELL said yes.  HUNTER asked if BLACKWELL was straight.

32

BLACKWELL said he was cool, and then asked if HUNTER had everything ready. HUNTER said he was waiting on BLACK. BLACKWELL asked if HUNTER was talking about BLACK. HUNTER said yes. BLACKWELL said he had spoken to BLACK and BLACKWELL said [UI]. BLACKWELL asked if anybody was talking about playing music. HUNTER said no, and asked if he was referring to getting that. BLACKWELL said yes. HUNTER then said yes. BLACKWELL asked if it was a lot of people. HUNTER said yes, and added that was why the guy was asking where BLACKWELL was at. BLACKWELL asked if the guy was the only person that came in. HUNTER said yes, and added that he thought "they" were around a little bit.

59. Based on this conversation, I believe that HUNTER and BLACKWELL were discussing a load of cocaine that they were waiting on. BLACKWELL said the load was not back yet. BLACKWELL also asked HUNTER if he everything ready for the load's arrival. HUNTER said that he was waiting on BLACK. I believe that HUNTER was telling BLACKWELL that he was waiting on Rick BLACK to finish getting the load car ready. HUNTER also told BLACKWELL that he felt the police "were around a little bit."

### FEBRUARY 14, 1997

60. At approximately 10:38 a.m., an outgoing call was placed on HUNTER's cellular telephone to cellular telephone (310) 487-3334. During the conversation, HUNTER told TURRENTINE that they were talking about "48." TURRENTINE said it would be tomorrow, some time in the afternoon. HUNTER said okay. TURRENTINE said it was close to [UI]. HUNTER said TURRENTINE

33

could take his time.  TURRENTINE then asked if HUNTER had spoken
with "E."  HUNTER said no.  TURRENTINE said that "E" was saying
something about his boy from [UI] way.  TURRENTINE asked if
HUNTER understood what he meant.  HUNTER said yes.  TURRENTINE
said that the guy was supposed to be in pocket around here with a
"2-5 ticket."  HUNTER sounded surprised.  TURRENTINE said he was
surprised that the guy had not spoken with HUNTER.  HUNTER said
the guy did not tell him.  TURRENTINE told HUNTER to call the guy
to see what was happening.  HUNTER said okay.  TURRENTINE said
the guy was supposed to have "200 pounds" because that was how
much she weighed, and added that girl was something else.  HUNTER
added that he would call the guy.

61.  Based on this conversation, I believe Julius TURRENTINE
and HUNTER had discussions about 48 kilograms of cocaine waiting
to come in. Julius TURRENTINE said that there was supposed to be
someone in Los Angeles ("around here") who had 200 pounds of
cocaine ("in pocket") and was selling kilograms for $12,500.
HUNTER said he was going to call the guy.

62.  At approximately 10:48 a.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, HUNTER asked DORSEY if his boy got it.  DORSEY said
"Mike-Mike."  HUNTER asked if that was right.  DORSEY said yes,
and added that the guy was supposed to be coming in.  HUNTER
stated that big fat boy "Tommy" [PHONETIC] for what.  DORSEY said
that the guy should have "sold it for 205," and added that the
guy was trying to find out if it was a dozen, but he told the guy

34

that he did not think so.  DORSEY said the guy was coming this way.  HUNTER asked when.  DORSEY said the guy would be here tonight and it should be right in that area.  DORSEY stated that he told the guy that he was not making anything, just trying to play the [UI].  HUNTER told DORSEY to let him know.  DORSEY said that they were finished here.  DORSEY said 200.  HUNTER then told DORSEY to let him know when he was ready.

63.  Based on this conversation, I believe that HUNTER and DORSEY had a conversation about Michael BLACKWELL picking up a load of cocaine.  DORSEY confirmed it was 200 pounds and told HUNTER to let him know when it was ready, so he could have the money ready to pay for it.

**FEBRUARY 15, 1997**

64.  At approximately 8:00 a.m., an outgoing call was placed on HUNTER's cellular telephone to cellular telephone number (310) 487-3334.  During the conversation, HUNTER told "Big Boy" that "they" were not that cheap after all, and that the boy did not even call back, adding that it was "35."  HUNTER said he did not think so, though, and that [UI].  HUNTER said he told the boy to check and make sure because somebody else was telling him something else.  HUNTER reiterated that he had him check because it was not the same thing.  HUNTER said he guessed they would just have to wait, then asked if "Big Boy" was going to be around today anyway.  "Big Boy" replied yes.  HUNTER said he would let "Big Boy" know then.  "Big Boy" said he would just keep the [UI].  "Big Boy" added, "Later on in the afternoon, I guess."

35

65.   Based on this conversation, I believe that HUNTER told Julius TURRENTINE that he had met the source and found out the price was $13,500 per kilogram. The two discussed the price being too high.

66.   At approximately 8:14 a.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 822-1429 (Erik DORSEY's residence telephone).  During the conversation, DORSEY explained he did not expect him on Saturday, that he called over to the house, and "Loc's" girl and her brother were there, so he told him over the phone that he was trying to make the delivery, so he sent the brother downstairs and started vacuuming.  HUNTER then asked if DORSEY thought he could talk his boy down to a "30." DORSEY replied he could try.  HUNTER told DORSEY to call, then added he told "Big Boy" it was "35."  HUNTER added that if they could get that at "30," that would be cool because he did not want to be getting nothing for nothing.  DORSEY reiterated that he would try.  HUNTER said, "cut the Big Boy [UI]."  HUNTER reiterated he told "Big Boy" it was "35," and that [UI], it would be alright.  DORSEY asked if HUNTER was talking about the [UI]. HUNTER said he was going to tell an U/M something else.  HUNTER asked what it was.  DORSEY replied it was "4-1-something." HUNTER said it was him.  DORSEY said "they" covered for HUNTER. HUNTER laughed.  DORSEY said "she" slipped at first, but then "she" covered, saying HUNTER did not live there, and that DORSEY had gotten the wrong house, but by then he had already caught it. DORSEY said he would page HUNTER later.

36

67.   Based on this conversation, I believe HUNTER and DORSEY were talking about the price of the cocaine they were trying to buy. HUNTER said he told Julius TURRENTINE it was $13,500 per kilogram.   DORSEY asked HUNTER to try and talk the source into selling it for $13,000 per kilogram.

68.   At approximately 1:01 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 737-5908 (Thomas MADISON's residence).   During the conversation, HUNTER told MADISON that he was waiting.   HUNTER then added that he was not going to do it because he thought it was [UI] but right now the guy told him that he had to do it "14" [UI].   HUNTER asked MADISON what did he tell him.   MADISON said that was what he had said.   HUNTER said he was over with him right now.   HUNTER then said that he was going to holler at him and see if they could do something, and then he would call MADISON back.   MADISON said okay, and added that he had something else, so he was trying to see about that.

69.   Based on this conversation, I believe MADISON told HUNTER that he had found a source for cocaine and that the source was selling them at $14,000 per kilogram. HUNTER said he was going to check on a price and call MADISON back.

**FEBRUARY 16, 1997**

70.   At approximately 9:29 a.m., an outgoing call was placed on HUNTER's cellular telephone to (310) 822-1429.   During the conversation, HUNTER asked DORSEY if "Mike and them" were in the "V."   DORSEY said no.   HUNTER asked if they were at the house.

37

DORSEY said they should be. HUNTER then inquired about "Big O-R." DORSEY said that they stopped them in "V," and "J-Man" took over. HUNTER stated that his auntie went to Vegas, so he wanted "him" to show them around a little bit. DORSEY said that [UI] came down with [UI]. HUNTER asked if "he" was here. DORSEY said yes, and added that he was going to hit "Carlos" [PHONETIC] up. HUNTER said okay, and added that if "he" came through, for DORSEY to tell "Big Boy" and them "if they said 31, that it was 36." DORSEY said okay, and added he would hit HUNTER back.

71. Based on this conversation, I believe HUNTER contacted DORSEY to confirm BLACKWELL came in from Las Vegas ("V") with a load of cocaine. HUNTER told DORSEY to tell TURRENTINE ("Big Boy") that he was to sell the kilograms at $500 over cost.

72. At approximately 3:10 p.m., an outgoing call was placed on HUNTER's cellular telephone to (310) 487-3334. During the conversation, TURRENTINE asked if HUNTER needed a buy. HUNTER said yes, but not right now. TURRENTINE said he would come over to HUNTER's location. TURRENTINE said HUNTER had a little change. HUNTER said TURRENTINE could just shoot over there to "B" (BLACKWELL).

73. Based on this conversation, I believe that Julius TURRENTINE asked HUNTER if he wanted part of the load that he had just received. HUNTER said yes, and told TURRENTINE to take it to BLACKWELL's.

74. At approximately 5:05 p.m., an outgoing call was placed on HUNTER's cellular telephone to (310) 822-1429. During the

38

conversation, HUNTER identified DORSEY as "Muddy" [PH] and asked
if DORSEY had talked to "Big Boy." DORSEY said yes, and that the
guy had just left. HUNTER asked if "Big Boy" had given DORSEY a
number. DORSEY said the guy was up at the house. HUNTER said he
might have found an avenue, but it was going to be a little bit
more. HUNTER placed a second outgoing call which did not
register on the pen register. During the conversation, HUNTER
told DORSEY that he had found an avenue, but that they were
talking about "39." HUNTER said they said it might be tomorrow,
but that he was not sure. HUNTER said it was DORSEY's decision.
DORSEY said he could not do it until Wednesday, and that he would
only be holding onto it until Wednesday. HUNTER said it was
hard. DORSEY said he understood. DORSEY said it did not matter
right now.

75.    At approximately 5:09 p.m., an outgoing call was placed
on HUNTER's cellular telephone to (310) 821-9226 (Michael PARKS).
During the conversation, HUNTER asked what the number was. PARKS
asked if HUNTER meant what the number was right now, what he had
in the box. HUNTER said yes. PARKS said it was "35." HUNTER
asked if it was "35-35." PARKS said no, it was "20," but he did
not know where everyone else was. PARKS said he knew what HUNTER
and Mike would do, so that was "2 and 2," so that would be "24."
PARKS said "Old Boy" would probably do that, so that would be
"28." PARKS said it would be "about 30." HUNTER told PARKS to
have "that 35" ready to go just in case. PARKS said that was all
out of his hands now, and that it was "Old Boy's." PARKS said he

was at home now.  HUNTER said he just wanted to see what was there.

76.  Based on this conversation, I believe HUNTER called PARKS to verify the total amount of kilograms he had. PARKS said he had about 30 kilograms.

**FEBRUARY 17, 1997**

77.  At approximately 4:53 p.m., an outgoing call was placed on HUNTER's cellular telephone to cellular telephone number (310) 487-3334.  During the conversation, HUNTER asked "Big Boy" (TURRENTINE) if those were "4 at 20." "Big Boy" replied yes. HUNTER said "Big Boy" had previously told him they were 21, before "they" went back.  HUNTER said "Big Boy" had told him he had "four left at 21." "Big Boy" disagreed and said he had sold them for 20 back then.  "Big Boy" explained he went down because HUNTER had so many of them, and added he did not know if HUNTER remembered, but that was the way it went.  HUNTER said he did remember that, but "Big Boy" also told HUNTER 21.  "Big Boy" said that was why he could sell HUNTER 80, adding he had "80 out there, too," if he wanted them.  "Big Boy" asked if [UI].  HUNTER replied he did not think so, adding he had not even called "Freddy." "Big Boy" said he went to speak to "Freddy" yesterday. HUNTER said he had been cooking up how he was going to do it because [UI].  HUNTER said he was just calling because he thought it was going to be "21." "Big Boy" assured him it was at "20."

78.  Based on this conversation, I believe Julius TURRENTINE told HUNTER he had 80 kilograms here in California that HUNTER

40

could have, and that he had another 80 in St. Louis, Missouri
("out there"). TURRENTINE said he would sell them to HUNTER for
$12,000 each.

79.  At approximately 5:47 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, HUNTER identified DORSEY as "Muddy" [PHONETIC],
then asked if he should go ahead and hold on for "J-R" and them.
DORSEY asked how long.  HUNTER replied he was just saying because
"they" would not give "him an act" [PHONETIC].  HUNTER asked if
DORSEY knew what he was saying.  DORSEY asked if he was referring
to "the 11."  HUNTER replied no, that he was referring to the
"more" [PHONETIC].  DORSEY asked if "they" were going to do it,
if "they" were talking about it.  HUNTER replied no, adding
"they" were talking about not giving them love.  DORSEY asked if
however, "they" were saying "they" could do it.  HUNTER replied
yes.  DORSEY asked, "at what?"  HUNTER replied it would be at the
same thing.  DORSEY asked if that would be "3-5."  HUNTER replied
yes.  DORSEY said it was really HUNTER's call, adding "they"
could do better, at least like "3-2-5 or 3-2-60."  HUNTER agreed
and said he was going to let "them" come to "Big Boy," because
"Big Boy" did not have the money ready yet anyway, adding "Big
Boy" said he would not be ready until around Wednesday because,
like DORSEY said, not everyone had theirs in yet.  HUNTER said he
was going to play "them" out.  DORSEY asked if HUNTER was going
to see how things were going to go.  DORSEY added HUNTER should
hold out for at least "3-2-50."  HUNTER said he knew and added he

41

had just done that. HUNTER said he would call "them" right now
to say, "no go," and then he would call/page DORSEY if "he"
wanted "that 11."

80. Based on this conversation, I believe HUNTER and DORSEY
had further discussions about the price the source was charging
them for the cocaine they were trying to buy. DORSEY told HUNTER
to hold out for $13,250 per kilogram.

**FEBRUARY 18, 1997**

81. At approximately 10:37 a.m., an incoming call was
received on HUNTER's cellular telephone. During the
conversation, HUNTER asked what time BLACKWELL thought it would
be. [HEAVY STATIC]. BLACKWELL replied he was already touching
ground now, adding that he was waiting for one more person, so it
would be in about two more hours.

82. Based on this conversation, I believe HUNTER called
BLACKWELL to check on how he was collecting the money. BLACKWELL
said he was ready and was waiting on one more person to come up
with the money.

83. At approximately 5:12 p.m., an incoming call was
received on HUNTER's cellular telephone. During the
conversation, HUNTER greeted DORSEY and then told DORSEY to hold.
HUNTER said that they are acting funny now, talking something
else that it was 50, instead of 51. DORSEY mentioned that HUNTER
counted everything right in front of their faces. An U/M came to
the phone and asked DORSEY if he had spoken with "Ol' Boy."
DORSEY asked who was that. The U/M said, "Loc." DORSEY said not

42

yet, but he would hit him up, and that he would not be there for
long. The U/M then asked if DORSEY had that one more. DORSEY
said yes. The U/M asked if he dropped them off. DORSEY said
yes. The U/M said he was just waiting on "Loc" to call him.
DORSEY said okay. The U/M then passed the phone back to HUNTER.
DORSEY then told HUNTER to tell "Turp" (Julius TURRENTINE) that
"Willie" had asked for "Turp" to call him back. HUNTER told
DORSEY that they were tripping now. DORSEY said that they
counted right there. HUNTER said yes, but like before they would
not give it to brother, so HUNTER knew that they had it. DORSEY
asked what did he say. HUNTER said that they did not have any
more extra ones, some extra bucks. HUNTER said he was not
tripping because he was not going to give them that either.
DORSEY said that HUNTER did it right there: 20, 20, 4, 3, and
then came back with another 4. DORSEY said that they counted it
right there. DORSEY said HUNTER did the 4, from the 4 from the
20, 3 from "Old" [PHONETIC] and them and then the other ones came
right because that was today; that 21-21. HUNTER then told
DORSEY he was going to call that guy back to see what was up.

84. Based on this conversation, I believe that HUNTER and
DORSEY discussed a problem with the source over the amount of
money that was paid for 50 kilograms of cocaine.

85. At approximately 5:48 p.m., an incoming call was
received on HUNTER's cellular telephone. During the
conversation, HUNTER asked DORSEY if he remembered about "the
extra stuff," the ones that he paid too much. DORSEY said yes.

43

HUNTER said that might have been it, once he thought about it.
DORSEY asked how much extra was there.  HUNTER said there was
probably around 7 or 8; 26 and 8.  HUNTER then mentioned that
there was a 4, and then there were some that he slapped together,
so those could have been.  DORSEY asked if those could have been
his extras.  HUNTER said yes.  DORSEY said he was going to be at
the house in 10 or 15 minutes.  HUNTER said okay, and added he
was taking "Torian" [PHONETIC] to Century City, and then he had
to go to "Little "M" (BLACKWELL).  DORSEY told HUNTER to hit him
whenever he was ready.  HUNTER said okay.

**FEBRUARY 19, 1997**

     86.  At approximately 9:38 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, HUNTER asked if DORSEY remembered where "Big Tone"
was staying.  DORSEY said yes.  DORSEY asked when.  HUNTER said
in the morning.  DORSEY asked if it was going to be that early.
HUNTER said yes, if DORSEY wanted to.  DORSEY said he could do
that a little later on.  HUNTER said he would tell the guy about
9:00.  DORSEY told HUNTER to have the guy hit DORSEY on the hip.
HUNTER said he would hook up with DORSEY later on that day, so
that he did not have to take HUNTER.  HUNTER said he would hit
DORSEY tomorrow morning for that also.

     87.  At approximately 10:46 p.m., an outgoing call was
placed from HUNTER's cellular telephone to (213) 365-1380.
Initially, HUNTER and COOPER had a casual conversation.  COOPER
asked if HUNTER remembered making any calls to Missouri or Reno,

Nevada. HUNTER asked what phone COOPER was talking about. COOPER said it was from HUNTER's car phone. HUNTER asked how many calls had been made. COOPER said she had two to Missouri. HUNTER said he had never called Missouri, but he had called Reno. HUNTER said he had called "Sterling" in Reno. COOPER said HUNTER's car phone bill was about $1,600. HUNTER said they were going to have to correct that, because his phone was cloned. COOPER corrected herself and said the bill was $1,200. COOPER said HUNTER needed to look through the bill and check it over. HUNTER and COOPER then resumed their casual conversation.

## FEBRUARY 20, 1997

88. At approximately 11:22 a.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, HUNTER told DORSEY that Junior would be over in 50 minutes or an hour. HUNTER said it would be a "dime ski." HUNTER said that was it, and that the guy had said he would hit him if he got lost. DORSEY asked if HUNTER meant that DORSEY was going to buy "ten tacos." HUNTER said yes. HUNTER said DORSEY had to give the guy whatever he had, and that they would give the guy the rest later on. DORSEY asked if HUNTER wanted him to give the whole thing to the guy. HUNTER said no, "only 73." HUNTER told DORSEY to take out whatever HUNTER had coming. DORSEY said he would just put that to the side.

89. Based on this conversation, I believe HUNTER told DORSEY that he would be picking up ten kilograms from the source within the hour. HUNTER also told DORSEY to pay the source for a

45

previous load of 73 kilograms.

90.   At approximately 12:27 p.m., TFO Myers saw DORSEY and
Julius TURRENTINE exit a black Toyota Land Cruiser with paper
plates that had arrived at DORSEY'S apartment building.  TFO
Myers saw DORSEY and TURRENTINE meet a third unidentified
hispanic male subject. The three walked up the stairs into
DORSEY's apartment building. The hispanic male was carrying a
luggage bag.  Approximately ten to fifteen minutes later, the
hispanic male was seen leaving the complex alone in a car.

91.   TFO Frankie Yan later obtained a search warrant for
DORSEY's apartment at 7777 West 91st Street, Building E,
Apartment 1145, Venice (Playa del Rey), California. The search
warrant was signed by the Honorable Lance Ito, a judge of the Los
Angeles County Superior Court.

92.   Officers from the Los Angeles Police Department
("LAPD") assisted in serving the search warrant at DORSEY's
apartment. I also responded to DORSEY's apartment to assist in
the service of the search warrant.

93.   During the execution of the search warrant, I saw two
large duffle bags laying on the floor of the living room. There
were a total of approximately 56 kilograms of cocaine in the two
bags.  The kilograms were wrapped in brown colored paper with
tape around them.

94.   An additional ten kilograms of cocaine were seized from
under a dresser in a bedroom. I also located approximately 53
kilograms of cocaine under the bed in the same bedroom.  Officers

46

from LAPD located approximately $114,000 in U.S. currency in the same bedroom, and a loaded handgun in a dresser drawer in the same bedroom.

95. A large amount of paperwork was seized from the residence. The paperwork was in the names of: Tina Pichon, Erik DORSEY, Julius TURRENTINE and Michael PARKS. There were real estate records which indicated that DORSEY and Julius TURRENTINE were co-owners of a residence and a business in Las Vegas, Nevada. There was also paperwork with Michael PARKS' name on it inside the bedroom where cocaine, money and the handgun were seized. The paperwork indicated that DORSEY used the address of 2505 Second Avenue, Los Angeles, California. I know that DORSEY's mother, Elaine Dorsey, resides at that address. There was also paperwork in Julius TURRENTINE's name, which indicated that he uses an address of 1311 West 130th Street, #8, in Gardena, California. This paperwork was also found in the same bedroom as cocaine, money and the handgun.

96. At approximately 6:36 p.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 821-9226 (Michael PARKS' residence). During the conversation, HUNTER asked if he was talking to "Big T." "Big T." said yes. HUNTER asked where "E" (DORSEY) was. "Big T." said "E" was right there with him. HUNTER asked if "Big T." thought they would come over there where he was. "Big T." said he did not know. "Big T." asked where HUNTER was. HUNTER said he was on the way. When DORSEY got on the phone, HUNTER asked if he was at "Tucker Road" [PH]. DORSEY

47

did not seem to understand.  HUNTER asked if they were "tucked."
DORSEY said yes, but if they opened up his drawers then they
would find some [UI].  HUNTER asked if DORSEY was talking about
some other ones.  DORSEY said yes.  HUNTER said that was probably
all they got.  HUNTER asked about the other ones.  DORSEY said it
all depended how far they were going to go.  DORSEY said they
were going to find some there right away.  HUNTER said he was not
worried about that.  DORSEY said they would find some other
stuff, if they pulled out that bottom drawer where HUNTER had
tucked that "change."  HUNTER asked if DORSEY meant if they
pulled it all the way out.  DORSEY said yes.  DORSEY reminded
HUNTER that he had run out of room before that.  DORSEY said
HUNTER had to realize how much was there.  HUNTER said he knew
that.  DORSEY said they were deep.  HUNTER asked if they had dogs
there.  DORSEY said no, but that there were about 14 of them.
DORSEY said he turned around and started driving back up the
hill.  DORSEY said he did not "bone out" like that, he just
looked straight and kept going.  DORSEY said he was looking in
the mirror, and could see some of them running.  DORSEY said they
were about to run after him.  DORSEY said he "boned out" and hit
a corner.  DORSEY said his main concern was to let him get away
with the kids.  DORSEY said he did not care about anything but
getting his kids away safely.  DORSEY said Aaron had spotted the
lights on.  DORSEY said Aaron had seen the lights on and thought
that his mom must be home.  HUNTER said DORSEY should tell Tina
to go home, and then changed his mind and said no.  DORSEY said

the only good thing about all of this was that everything was in
his room.  DORSEY said Tina could just say that they were
roommates, and that she did not know where DORSEY was right now.
DORSEY said that way they could not really put anything on her.
DORSEY said that was what he hoped.  HUNTER asked what happened
if they pulled out the dresser.  DORSEY said if they pulled out
the dresser and found something, then they might start ripping
the house up.  HUNTER asked if they would see that if they pulled
the beddy-way open.  DORSEY said it depends on how far they were
going to go.  DORSEY said they would not see anything, but if
they decided to rip it, then they would find something.  DORSEY
said if they slipped it up, they would not see anything, but if
they tore it apart, then they would find some "work."  DORSEY
said they would find some "work" for sure.  HUNTER asked how
much.  DORSEY said about "50, 55."  HUNTER asked if DORSEY was
talking about "the other one."  DORSEY asked if HUNTER was asking
about how much "work" was up under the bed.  HUNTER said no, he
was talking about the small thing that might be in the open.
DORSEY said "ten at least, the ten today."  DORSEY said the ten
today was up under there, and all the "tapes" were still in the
bag.  HUNTER said they had that out the gate then.  DORSEY said
yes, they had that out the gate.  DORSEY wondered if they had
come through the door.  HUNTER said they did not see where the
guy had gone in.  DORSEY said maybe they saw him leave.  DORSEY
said he did not know what he had done different.  HUNTER said
DORSEY could say that they were just roommates.  DORSEY said

49

there was nothing in that room that belonged to Tina, so Tina
would not have any problems. DORSEY said she did not have any
idea about what he was doing. HUNTER asked if DORSEY had "wiped
them." DORSEY said no. DORSEY said they were going to have his
prints. DORSEY said he was going to be on the run. HUNTER told
DORSEY to hang tough. DORSEY said Tina did not need to go home
tonight, and that she was already shaken up. DORSEY said he knew
what he saw, and that he was not dreaming or tripping out.
DORSEY said that was the only way they could have gotten into his
car. DORSEY said they had to get into the house to get his car
keys, because he did not have it today. DORSEY said they must
have kicked in to get into the house. DORSEY asked where HUNTER
was. HUNTER said he was getting close to where DORSEY was.
DORSEY said he should probably go to "T's" house, because he did
not want them to come looking for him. DORSEY said they had all
kinds of information on him. DORSEY said they had information on
his house in Vegas, so they will be going there. HUNTER told
DORSEY to stay strong. HUNTER said they might just snatch "what
was out." DORSEY said that was a lot out. HUNTER asked if
DORSEY meant the ten. DORSEY said there was going to be "at
least 40," because "T's" was there too. DORSEY said 40 would put
him in for a while. HUNTER told DORSEY not to worry, because
they would come up with something. DORSEY said they were going
to find "Mike's" there, because they were in the bathroom.
DORSEY said they kept those in the bathroom. HUNTER said he was
about seven minutes away. DORSEY asked if HUNTER was going to

50

drive by.  HUNTER said no, he and "J" were there.  HUNTER asked
if DORSEY wanted to get out of there.  DORSEY said yes, and that
he was going to call people and let them know what had happened.
DORSEY said he was going to call Mom [PH].  HUNTER told DORSEY to
give "D" the key, and have her check and see what was going on
after they had gone.  HUNTER asked if they were still in there.
DORSEY said he could not see from where he was.  HUNTER said he
would let DORSEY know.  DORSEY asked if HUNTER was going to drive
by.  HUNTER said not yet, but that he would DORSEY know in a
little while though.  HUNTER said he would call DORSEY back.

   97.  At approximately 7:15 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, DORSEY asked if HUNTER had talked to "Big Daddy."
HUNTER said no.  DORSEY said "Big Daddy" was not even answering.
HUNTER asked where DORSEY was right now.  DORSEY said he and
"Ronnie" (Ronnie TURRENTINE) were just riding, trying to figure
out where to go.  HUNTER told DORSEY to go out far.  HUNTER asked
where "D" was.  DORSEY said D was at the house.  HUNTER said "D"
should go hang out and be nosy over there.  HUNTER said "D"
should look and see what was going on.  DORSEY said "D" had the
kids.  DORSEY said he just could not figure out where it came
from, because he had not gone anywhere.  DORSEY said he was at
[UI] all day today.  DORSEY said he did not know why they did not
rush him over there where he was.  HUNTER asked where the
Cadillac was.  DORSEY said it was parked down the street, and
that he had the keys.  HUNTER asked if they were up on that.

DORSEY said no.  HUNTER asked about "the low one."  DORSEY said
it was parked around the bend, and that someone had to go and get
it.  DORSEY said it looked like it was safe.  DORSEY said he
would probably get "Ronnie" to see if he could creep over there
to see if anyone was watching it.  DORSEY said it did not have
any plates on it, but they saw it.  DORSEY said they had seen him
in it.  DORSEY said they were not expecting it.  HUNTER told
DORSEY to hold tight.  HUNTER asked if they were expecting to see
him.  DORSEY said they looked like they were not expecting it,
because they would have been arrested.  DORSEY said they would
have drawn down on it.  DORSEY said they would have been looking
for a hit.  HUNTER said, "I didn't touch a lot of them things,
did I?"  DORSEY said he did not know.  HUNTER asked if DORSEY had
"wiped them."  DORSEY said no.  DORSEY said he did not handle
them much today.  HUNTER told DORSEY to stay calm, and that he
knew what he had to do.  DORSEY said he was worried about what
"T" was going to do.  HUNTER told DORSEY to tell them not to say
anything.  DORSEY said someone else had to get to them also, in
order to tell her.  HUNTER asked where she was.  DORSEY said she
had gone to get the kids from "T."  HUNTER asked if DORSEY meant
"Big T." DORSEY said yes.  DORSEY said he was receiving a page
right now.  HUNTER asked what number DORSEY was getting, because
HUNTER had two phones with him.  DORSEY said the number was 397-
4852, and said that was Carlos.  DORSEY said he could go up there
and get that white van and go somewhere, if push came to shove.
DORSEY said they left that there.  DORSEY said he could not even

52

get his vehicle. HUNTER said it was safe to "bone out," and that
they were right there right now. HUNTER said DORSEY could just
get that and hit the road. DORSEY said that was probably what he
was going to do with the white one. DORSEY asked where HUNTER
was. HUNTER said he was over at "J's" job.

98. Based on this conversation, I believe HUNTER called
DORSEY and asked if he (HUNTER) had touched a lot of the
kilograms.

99. At approximately 7:23 p.m., an incoming call was
received on HUNTER's cellular telephone. During the
conversation, HUNTER told BLACKWELL that they had gone after
"E's" (DORSEY's) stuff. BLACKWELL asked if they had gone to
"E's" house. HUNTER said yes. HUNTER said they had found "T's"
(TURRENTINE'S) in there right now out the gate. HUNTER said he
was sure they had found "T's," but there was a chance that theirs
... BLACKWELL asked how much "T's" was. BLACKWELL asked if
HUNTER was talking about [UI]. HUNTER said yes. HUNTER said
"T's" was the only thing in the open, that they probably found
his out the gate, but that theirs was tucked. BLACKWELL said
they would tear it up. BLACKWELL said everything was gone.
HUNTER said he was hoping ... BLACKWELL said they would not go
there and not tear it up. BLACKWELL asked where "E" (DORSEY)
was. HUNTER said "E" was coming this way, and that he was
"boning out." BLACKWELL asked if "E" had gone in there. HUNTER
said no, because he had come up and seen the lights on inside,
and just kept going. HUNTER said "E" had not even been there.

53

HUNTER said "E" had met Junior's cousin today.  HUNTER asked
where BLACKWELL was.  BLACKWELL said he was over at Freddie's.
HUNTER asked if they would pick that up if they tore it up.
BLACKWELL said that was a lot, and asked how many there were.
HUNTER said "there were about 100 and something altogether."
BLACKWELL asked if they were all in one place.  HUNTER said yes.
BLACKWELL said "T-Man" never came and got them.  HUNTER said
"T's" was out in the open.  HUNTER said the other one was tucked,
and that was why he was wondering if they were going to ...
BLACKWELL said they were going to shut that whole house down.
HUNTER asked if BLACKWELL meant they were going to tear it down.
BLACKWELL said no, they were just going to shut the house down,
and that no one would be allowed to go in.  BLACKWELL asked where
"E" was going.  HUNTER said "E" was "boning out," and that he
knew he had to get away.  HUNTER said his girl and his brother
were going to go over there and see what the situation was.
HUNTER said that was why he hoped they stopped with what they had
found.  HUNTER asked if BLACKWELL thought they would board up the
door.  BLACKWELL said yes.  BLACKWELL said he did not know what
they were going to do.  HUNTER told BLACKWELL to hold on, and
answered the other telephone.  HUNTER said he thought it was from
the "Way-Way" [PH] because he knew it was not from him.
BLACKWELL said he was "straight broke."  HUNTER assured BLACKWELL
that he was not broke.  HUNTER said he would just have to give
all of his up.  HUNTER said BLACKWELL would probably just have to
go that way, and that he could get all of his.  HUNTER said that

54

was what he would have to do.  BLACKWELL said he would not talk
any more.  HUNTER asked if BLACKWELL was going to holler.
BLACKWELL said not yet, and that he would see what happened.

100. Based on this conversation, I believe HUNTER and
BLACKWELL spoke about the seizure of cocaine at DORSEY'S
apartment. HUNTER said the police found "T's" cocaine (Julius
Turrentine's) because it was sitting in the open. HUNTER said he
wasn't sure if the police found their's because it was hidden.
HUNTER said there were over 100 kilograms seized altogether.
BLACKWELL said he was broke (because of the seized money).

101. At approximately 8:10 p.m., an incoming call was
received on HUNTER's cellular telephone.  During the
conversation, COOPER said they had just passed by again.  COOPER
said they were looking for the truck, and she had seen that there
were no more white ones there.  COOPER said there were about four
or five of them hanging out, but they were a little farther down
the street, like they were trying to break it up now.  HUNTER
told COOPER to hold on.  HUNTER told DORSEY in the background
that they were starting to break it up now.  COOPER said there
were only four or five people hanging out there, and that there
was no one in the house.  COOPER said she had looked quickly, and
that it looked like everyone was leaving.  COOPER said there were
no more black and whites or anything.  COOPER said she was going
to get out and walk right now, and that they were looking for the
truck but they could not find it.  COOPER said she and "Calvin"
were thinking that if it were all that, then the media would be

55

there. COOPER said there was no media there. HUNTER told DORSEY in the background that if it was all that, then the media would be there. DORSEY said they had to find the truck, and asked to speak with COOPER. DORSEY asked if COOPER found the truck. COOPER said they were on Saran right now, and wanted to know whether she should go left or right. DORSEY asked which way COOPER was going. COOPER said she was traveling toward the beach now, and had just passed Gulana. COOPER gave the phone to an U/M. The U/M said Saran turned into Redlands behind the school, on Redlands and Gulana. DORSEY said that was the school right across from the building. The U/M said yes. DORSEY told the U/M to go around the building. The U/M asked if DORSEY meant on Manchester. DORSEY said no, go to the stop sign and turn right. DORSEY said the U/M had to go on the back side of the building. The U/M said there was a little alley, and he was turning down the alley right now. The U/M gave the phone to COOPER, and COOPER said they saw the truck. DORSEY told COOPER to at least grab the little bag out of there so that they would not be able to easily associate DORSEY with the vehicle. DORSEY said Aaron's backpack was in there. DORSEY told COOPER to park next to the truck, and sit there for a minute. DORSEY asked if they were going to take the truck. COOPER said yes, but that they were just going to walk the street right now and see what was going on. COOPER said there was no one back there. DORSEY told COOPER to tell Tina that he needed to talk to her if she saw her. COOPER asked what Danette's apartment number was. DORSEY said it

56

was 2016 in the J building. COOPER said she would call back and report back to DORSEY in a minute.

102. Based on this conversation, I believe HUNTER sent COOPER and a subject named "Calvin" (LNU) to check on what the police were doing at DORSEY's apartment. HUNTER was talking to COOPER when DORSEY got on the telephone and gave her directions to where a truck was parked. DORSEY told COOPER to find the truck and to take a little bag out of there so he wouldn't be associated with the vehicle. COOPER told DORSEY that she and Calvin were going to walk the street to see what was going on and that she would report back in a minute.

103. At approximately 8:33 p.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, "Junior" asked what happened. HUNTER said he did not know, and that they had come in there. HUNTER said he could not say exactly what happened, but that they were still over there, and he knew they found a lot. "Junior" asked what happened to HUNTER's cousin. HUNTER said his cousin was not even there. HUNTER said his cousin was about to pull up there, had seen that the lights were on, and kept rolling. HUNTER said his cousin was not gone, that he was still here. HUNTER said they did not catch anybody at the house. "Junior" asked what time that had happened. HUNTER said that happened at about 4:00 or 5:00, right after "Junior" left. "Junior" said he left at about 1:00. HUNTER repeated that it happened at about 4:00 or 5:00. HUNTER told "Junior" to hold on, and answered an incoming call.

57

COOPER said he went to go get the truck and that he would meet her at the bowling alley. COOPER said they would get the truck first, and then they would go back and get the other truck. COOPER said when she passed by there, the lights were still on, but there were only two cars and maybe three or four guys still there, and that was all. HUNTER asked if COOPER thought they stumbled on the other. COOPER said it seemed like they would have had everybody there, and there would have been mass media. HUNTER asked if COOPER had the Cruiser. COOPER said yes, and that the guy had gone to get it. COOPER said he was going to meet her at the bowling alley, because she passed right by. HUNTER asked if COOPER was going back over and check again. COOPER said no, not in the Crui ... HUNTER said no, not in that. COOPER said she would not go in the vehicle she was driving either. COOPER said there were not many people going by, and if they saw her go by three times then that would be suspicious. HUNTER told COOPER to hold on, and answered an incoming call. HUNTER said he would call "Junior" back later. HUNTER and COOPER resumed their conversation. COOPER said they were going to take this one, and then come back, since it was so close out here. COOPER said they would take that one first, and then go get the other one that was up there. HUNTER said he thought if they found the other one, then there would have been ... HUNTER asked what COOPER thought. COOPER said it seemed like there would have been more attention. COOPER said that would be spread worldwide. HUNTER said they should get some moving people to move the stuff.

58

COOPER agreed.  HUNTER said they might have been stumbling on the other.  COOPER said it really did not seem like that.  COOPER said that was just too quick, and they would be there a lot longer.  COOPER said if they would have known, then they would want to catch someone.  HUNTER said it might hold out and be "tight-didy" [PH].  COOPER agreed.  HUNTER said he was hoping that was the case.  HUNTER told COOPER to keep her phone on.  COOPER said the battery was low, but she would keep it on.  HUNTER asked if they were going to go to Calvin's house.  COOPER said no, they were going to take it to Freddie's.  HUNTER asked if she was going to park it at Freddie's.  COOPER said yes, and that she would keep the keys.  COOPER said that was where she was going to take the other one too.

104. Based on this conversation, I believe that COOPER and Calvin were continuing to help HUNTER by moving vehicles and providing him intelligence about what the police were doing.

105. At approximately 8:54 p.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 769-0068 (unknown subscriber).  During the conversation, an UM answered by saying "Clammy's" [PHONETIC].  HUNTER asked to speak with PARKS.  When PARKS got on the line, HUNTER said he had his girl go by there, and she had said that it seemed like they were breaking up.  HUNTER said he did not know if they were under.  PARKS asked if they were all "blackie-blackies" or all "undie-undies."  HUNTER replied yes ["undie-undies"].  HUNTER added he thought they probably just went on with ...  PARKS interrupted by saying he

59

knew what HUNTER was talking about.  HUNTER then asked PARKS'
whereabouts.  PARKS replied, "at the shop."  HUNTER said right.
PARKS replied at the shop, not that one, another one.  HUNTER
asked if he wanted to hoop up.  PARKS replied no and added he was
going to home to talk to "Grom" [PHONETIC], and that he would hit
HUNTER back after he hooked up with Grom.  PARKS said he wanted
to ask why they would go in if nobody was there.  PARKS asked
HUNTER to hold on.  HUNTER said he wondered if they had "printed
all those things."  PARKS asked if HUNTER was on them.  HUNTER
replied probably just on a few, but then again they were probably
checking.  HUNTER said that did not mean anything because they
still had to have a body.  PARKS said they got it over there at
that place.  HUNTER said the little prints did not matter so they
should be alright.  PARKS commented not if they started
"singing."  PARKS asked if HUNTER had talked to [UI].  HUNTER
replied he already knew and that "he" [UI] just had to go.  PARKS
then asked what about "Double B," "Big Boy," "B-B."  HUNTER
replied he did not know, and then said they needed to talk, to
hook up right now.  PARKS told HUNTER to set up an appointment
with "him."  HUNTER asked about what time.  PARKS replied maybe
9:30.  PARKS said he needed to talk to "him."  HUNTER said that
if they were not under then it should be on the media.  PARKS
asked what HUNTER meant.  HUNTER said it should be on TV.  HUNTER
said his girl's "bro" was saying that it was clearing up.  PARKS
said [UI] and told HUNTER he would holler.  HUNTER said okay.

    106. Based on this conversation, I believe HUNTER and PARKS

talked about HUNTER"S fingerprints being on some of the kilograms
that were seized. PARKS told HUNTER to set up a meeting with "BB"
to discuss what they were going to do.

107. At approximately 8:54 p.m., an incoming call was
received on HUNTER's cellular telephone. During the
conversation, COOPER told HUNTER that "he" got on the freeway and
she got on a different freeway. COOPER added she was on her way
there, and she should be arriving in ten or fifteen minutes.
COOPER said she told "him" she would meet "him" there. COOPER
said "he" wanted to talk to HUNTER. She told "him" that "he"
could talk to HUNTER when they arrived there, because when they
arrived they could just clean everything up and throw it in this
car. HUNTER asked if somebody was behind him. COOPER said that
when "he" came out of the bowling alley the two "black and
whites" were not sitting right behind "him"; they were facing the
opposite direction, and "he" had to pass right in front of them.
HUNTER stated he was just pulling up by her car right now.
COOPER said oh, over there. HUNTER said it did not seem like a
big deal then. COOPER said no, it did not because if it was they
would not be hanging out there, but the four guys were just
hanging. HUNTER said they probably missed that under. COOPER
said she hoped so, and added it seemed like they did. HUNTER
said okay. COOPER then asked if that white truck was cleaned
out. HUNTER told COOPER he took out his junk and any paperwork
with their names on it. COOPER told HUNTER to take everything
out. HUNTER said okay and asked COOPER to keep him posted.

61

COOPER said she would.

108. At approximately 10:49 p.m., an outgoing call was
placed from HUNTER's cellular telephone to (714) 673-9620.
During the conversation, BLACKWELL told HUNTER that he was
calling from a pay phone.  BLACKWELL said "Big R" wanted an
investigator down there.  HUNTER said okay.  BLACKWELL said the
guy was on Manchester and Pershing.  HUNTER said "E" (DORSEY)
was with him right now.  HUNTER said all of them were there with
him.  BLACKWELL asked if it was "Big T."  HUNTER said yes, and
reiterated that all of them were with him right now.  BLACKWELL
said somebody had snitched on them.  HUNTER agreed, and added
that they could not get a warrant that quick.  BLACKWELL
reiterated that somebody had snitched, and added that he had seen
them going in there and straight to that place.  HUNTER said that
was what he was referring to.  BLACKWELL said that another thing
that "Grimes" [PH] had mentioned that they could have gone in
there and got what was there on top, and nothing from the bottom.
HUNTER said that was what he was thinking, and was almost sure
that it was that way.  BLACKWELL said somebody had to go in
there, so he was thinking that somebody had a key, or somebody
had to kick the door.  HUNTER agreed.  BLACKWELL said maybe
dressed up in a key outfit, like if they were going to change the
lock or something, and then they went through and go out.
BLACKWELL added that it could have also been that somebody in a
carpet cleaning company might have came to the house.  HUNTER
added he was going to tell BLACKWELL the [UI] of the street.

62

HUNTER put BLACKWELL on hold and discussed with an UM in the
background.  Eric then came to the phone.  Eric and BLACKWELL
greeted each other, and BLACKWELL asked Eric what was he doing.
Eric said he was trying to get out here.  BLACKWELL then asked
Eric if that was on Pershing Street.  Eric said no, and added
that was on 91st Street.  BLACKWELL asked if it was off of
Manchester where the turn off was at.  Eric said yes, and added
that it was Manchester and Gulana [PH].  Eric said Gulana turns
into 91st Street.  BLACKWELL asked Eric to spell Gulana.  Eric
said it was spelled G-U-L-A-N-A.  BLACKWELL said [UI].  Eric said
[UI].  BLACKWELL said he did not know the last name.  Eric said
it was "Pichon."  BLACKWELL reiterated that somebody was
squeaking.  Eric said he did not know.  Eric passed the phone
back to HUNTER.  HUNTER asked BLACKWELL if he was going to do
that.  BLACKWELL said yes, and then asked if everybody was
alright.  HUNTER said yes.  BLACKWELL asked if everybody had
shirts or jackets or something.  HUNTER said that everybody got a
little bit of everything.  HUNTER said tomorrow they were going
to find a little bit more.  BLACKWELL said that they were going
to put some things out.  HUNTER asked if he was referring to
warrants.  BLACKWELL said yes.  HUNTER agreed, and added that he
could call and check.  HUNTER asked if BLACKWELL remembered his
name.  BLACKWELL said no, and asked if HUNTER wanted him to.
HUNTER said he could check and see if there were any warrants
out.  BLACKWELL asked if he thought that they would come over to
his location.  HUNTER said no, but BLACKWELL should do that.

63

BLACKWELL asked what should he do. HUNTER said he should give them all their names, and see which one. BLACKWELL asked what was on top, in the rear in the open. HUNTER said yes, and added that it was right beside the bed. BLACKWELL then asked HUNTER if his boy was in this. HUNTER said that BLACKWELL knew what he had to do. BLACKWELL said okay. BLACKWELL mentioned that the guy was saying his name. HUNTER asked how did the they know their name. BLACKWELL said [UI]. BLACKWELL then asked HUNTER for the address. HUNTER said the address was 7777 West 91st Street, and the building was the 1145 "E" building. HUNTER said his phone was going to cut off. BLACKWELL asked HUNTER if he was sure about the address. HUNTER said yes. HUNTER said he was going call BLACKWELL back.

109. During some of the intercepted conversations, agents and officers were simultaneously conducting surveillance of certain locations and/or suspects. As a result of those surveillances and intercepted conversations, fellow agents/officers and I have identified the suspects and some of the locations involved with HUNTER's cocaine trafficking organization.

## 2505 Second Avenue, Los Angeles, California

110. Further described as an apartment located within a tan two story apartment complex, with a brown roof, white barred window coverings with white awnings. The residence is surrounded by a four foot block wall. The apartment complex is located on the southwest corner of the intersection of 25th Street and

64

Second Avenue.  The apartment is located on the south end of the
complex.  The apartment has a white barred door that faces north
and the numerals "2505" are posted above the door.

111. I believe this to be the residence of Elaine Dorsey,
the mother of Charles Erik DORSEY.  During the execution of the
search warrant and seizure of 119 kilograms of cocaine at Charles
Erik DORSEY's apartment, I found paperwork that indicated DORSEY
also listed 2505 Second Avenue as an address.  Some of the
paperwork included bank account statements, receipts for items
purchased, repair orders, income tax records and utility
statements. A California Department of Motor Vehicles ("DMV")
check showed that DORSEY has several vehicles registered in his
name to this address.

112. A California DMV check showed that Gerald HUNTER lists
2505 Second Avenue, Los Angeles, California, as his address of
record, and that HUNTER also has vehicles registered in his name
to this address.

113. During this investigation, HUNTER telephoned Michael
PARKS at cellular telephone number (213) 200-4278 on numerous
occasions. I obtained subscriber information from AirTouch
Cellular that showed PARKS lists the billing address for this
cellular telephone as 2505 Second Avenue, Los Angeles,
California.

114. AirTouch Cellular also lists 2505 Second Avenue,
Los Angeles, California, as a billing address for a cellular
telephone that Charles Erik DORSEY has in his name.  That

telephone number is (213) 703-6334.

115. Based on my training and experience, I know that narcotics traffickers will often have locations that they consider to be "safe-houses." These are locations narcotics traffickers use to list as billing addresses for cellular telephones and pagers, and on official government documents. These documents also include driver's licenses and state vehicle registration forms. Narcotics traffickers use these "safe-houses" to avoid police detection and the seizure of property and documents in narcotics investigations.

116. I believe that the search of 2505 Second Avenue, Los Angeles, California, will assist law enforcement in the investigation of the HUNTER cocaine trafficking organization. The search will also provide further evidence of the conspiracy by this organization to traffic in large quantities of cocaine.

15327 South Ainsworth Street, Los Angeles, California

117. The residence to be searched is further described as a one story, single family residence, beige stucco in color with brown wood trim. The residence is currently undergoing remodeling. The residence is located on the west side of Ainsworth Street. In front of the location is an unfinished block wall.

118. I believe this to be the address of Michael BLACKWELL. The number that HUNTER called when he spoke to BLACKWELL was cellular telephone number (310) 710-3021. Subscriber information I obtained from AirTouch Cellular lists the subscriber for

66

(310) 710-3021 as Michael BLACKWELL, 15327 Ainsworth Street, Gardena, California.

119. I also checked California DMV records and found that BLACKWELL lists this address on DMV records. DMV records also indicate that BLACKWELL has a vehicle registered to him at the same address on Ainsworth Street.

120. Based on my training and experience, I believe that BLACKWELL has items concealed at his residence which would assist law enforcement in its investigation of the HUNTER cocaine trafficking organization and further identify suspects involved in the conspiracy to distribute large quantities of cocaine. 8650 Gulana Avenue, Building L, Apartment #3164, Playa Del Rey, California.

121. The location to be searched is further described as an apartment located within a three storied, multi-unit apartment complex, beige with brown trim, surrounded by a brown wrought iron fence. The entire complex is located on the east side of Gulana Avenue. There are several buildings within the complex, each of which has a letter designator, as well as its own four-digit street address. The address "8650 Gulana Avenue" and the name "Cross Creek Village" appear on a large sign in front of the complex, facing south toward Gulana Avenue. Building "L" is adjacent to and south of the main pedestrian entrance of the complex. The west end of building "L" overlooks Gulana Avenue. Apartment #3164 is located on the third floor of Building L. The numbers "3164" appear on the front door of the apartment.

67

122. I believe this to be the residence of Michael PARKS. During the investigation, HUNTER often telephoned (310) 821-9226. I obtained subscriber information from General Telephone that showed the subscriber to be Michael PARKS, 8650 Gulana Avenue, #3164, Playa Del Rey, California.

123. Throughout this investigation there were numerous telephone calls in furtherance of the conspiracy between HUNTER, PARKS and other subjects on (310) 821-9226. Documents in Michael PARKS' name were also seized at DORSEY'S apartment at 7777 West 91st Street, Building E, Apartment 1145, Playa Del Rey, California on February 20, 1997, during service of the search warrant where 119 kilograms of cocaine were seized. The paperwork with PARKS' name on it was seized from the same bedroom where kilograms of cocaine were found. The paperwork consisted of an Automobile Club annual membership renewal and an AirTouch Cellular telephone bill. Both of these items were addressed to Michael Parks, 2505 Second Avenue, Los Angeles, California.

124. I believe that PARKS is actively involved in cocaine trafficking and that evidence is being concealed in his apartment that would assist law enforcement in investigating the HUNTER cocaine trafficking organization and further identify suspects in the conspiracy to distribute large quantities of cocaine.

553 South St. Andrews Place, Apartment #409, Los Angeles, California

125. The location to be searched is further described as a multi-story apartment complex, constructed of beige stucco. The

68

complex is located on the northwest corner of Sixth Street and
St. Andrews Place. The numbers "553" are affixed to the building
north of the entrance. Apartment #409 is on the fourth floor on
the northwest side of the building. The numbers "409" are in
white on a black placard against a white wooden door.

126. I believe this to be the residence of Jacquelyn COOPER.
AirTouch Cellular listed the cellular telephone used by HUNTER as
subscribed to by Jacquelyn Cooper. During the investigation,
HUNTER also called COOPER on numerous occasions at telephone
number (213) 365-1380. Pacific Bell lists the subscriber for
(213) 365-1380 as Jacquelyn COOPER, 553 South St. Andrews Place,
#409, Los Angeles, California.

127. Surveillance units also saw COOPER and HUNTER leave
that location together on January 8, 1997. I believe that COOPER
is assisting the HUNTER cocaine trafficking organization by
providing him cellular telephones and rental cars, as described
earlier in this affidavit. HUNTER also has an American Express
card under COOPER'S account that he has used to rent cars.

128. COOPER also assisted HUNTER on February 20, 1997, after
the police had seized 119 kilograms of cocaine from DORSEY'S
apartment at 7777 West 91st Street. Intercepted conversations
indicated that COOPER was providing HUNTER with intelligence
information about police activity at the search warrant location.
COOPER also obtained the assistance of a subject named "Calvin"
to help her gather intelligence and transport automobiles from
the vicinity of 7777 West 91st Street to another location in an

69

appart effort to thwart law enforcement's discovery of their existence.

129. I believe that COOPER is actively involved in assisting HUNTER in his cocaine trafficking activities, and that items are concealed in her apartment which would assist law enforcement in the investigation of the HUNTER cocaine trafficking organization. The search would further assist in identifying suspects involved in the conspiracy to distribute large quantities of cocaine.

<u>1311 West 130th Street, Space #8, Gardena, California</u>

130. The location is further described as a section of a commercial building. The building is of red brick construction with the numbers "1311" posted on the building facing south. The business is surrounded by a two foot red block wall with a blue wrought iron fence and gate. Razor wire is wrapped around the top of the wrought iron. Space #8 has black numbers posted on the doors. The entrance door is barred and faces south. Space #8 also has a roll up door that faces east.

131. I believe this to be a business owned by Julius TURRENTINE. During the wire interception, HUNTER placed numerous telephone calls to cellular telephone number (310) 487-3334. The conversations were in furtherance of the conspiracy to distribute cocaine. AirTouch Cellular lists the subscriber as Julius TURRENTINE, 1311 West 130th Street, #8, Gardena, California.

132. SA Bob Howell of the DEA office in St. Louis, Missouri advised me that TURRENTINE also has a cellular telephone with a number of (314) 412-2115. Ameritech Cellular in Illinois lists

70

the subscriber as Shanette Boclair, 4233 Gano, St. Louis,
Missouri.  On January 23, 1997, HUNTER placed an approximate
forty five minute telephone call to (314) 412-2115. Julius
TURRENTINE has been previously identified in this affidavit as
the receiver of that telephone call.  HUNTER and Julius
TURRENTINE discussed tactics for evading police detection during
that telephone call. SA Howell also told me that Julius
TURRENTINE owns several houses in the St. Louis, Missouri area.

133. On February 20, 1997, a search warrant was executed
at DORSEY'S residence located at 7777 West 91st Street.
Approximately 119 kilograms of cocaine and a large amount of
United States currency were seized from the apartment. Paperwork
in Julius TURRENTINE's name was seized from the same bedroom
where cocaine was seized. The paperwork consisted of real estate
insurance papers and property tax records. There was also
paperwork which indicated that Julius TURRENTINE and DORSEY co-
own a residence located at 4813 Yellow Pine Road, Las Vegas,
Nevada. Paperwork also indicated that Julius TURRENTINE and
DORSEY co-own a business in Las Vegas, Nevada, called E & J
Leasing.

134. During the search of DORSEY's apartment, I also located
paperwork that indicated that DORSEY listed his billing address
with "Classic Industries" as 1311 West 130th Street, #8, Gardena,
California. He listed his billing telephone number as (310) 323-
9271. The subscriber and billing address for that telephone
number is Stella Sanders, 1290 Challenge Lane, Las Vegas, Nevada.

71

135. On February 21, 1997, TFO Collins assisted in the execution of a search warrant at 4813 Yellow Pine Road, Las Vegas, Nevada. He seized paperwork in the names of Julius TURRENTINE and Charles Erik DORSEY.

136. On February 26, 1997, TFO Collins advised me that he was contacted by SA Sue Clay of the DEA office in Las Vegas, Nevada. SA Clay told TFO Collins that she went to the residence located at 1290 Challenge Lane in Las Vegas, Nevada, and contacted Stella Sanders at that location. Stella Sanders told SA Clay that she had never heard of Erik DORSEY or Julius TURRENTINE and had no information about either one of them. SA Clay said that there was a large boat in the driveway that had a California registration of 7585NB. California DMV records indicate that the boat is a 1990 Larsen, and that it is currently registered to Michael PARKS, 13428 Maxella Avenue, #413, Marina Del Rey, California.

137. On February 17, 1997, surveillance saw a 1997 GMC Yukon, Missouri license number 47M870, parked near DORSEY'S apartment located at 7777 West 91st Street. The car was registered to an address in St. Louis, Missouri. Julius TURRENTINE was observed by surveillance to drive from the area near DORSEY'S apartment to 1311 West 130th Street, Space #8, Gardena, California. Surveillance saw TURRENTINE enter the business and remain there for a period of time.

138. I believe that TURRENTINE is actively involved in the trafficking of cocaine with HUNTER and that items of evidence are

72

being concealed at 1311 West 130th Street, Space #8, Gardena, California. I believe that a search of that location would provide evidence of narcotics trafficking and would further assist law enforcement in the investigation of the conspiracy to distribute large quantities of cocaine.

## 3652 Carmona Avenue, Apartment #5, Los Angles, California

139. This residence is further described as a two story apartment type residence of beige stucco construction with dark green trim. The numbers "3650-3652" are affixed to the front, west facing side of the apartment building. The location is the 11th structure north of Coliseum Street, and is located on the east side of Carmona Avenue. The number "5" is posted on the front door of the residence.

140. On January 16, 1997, at approximately 8:18 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 294-7860, subscribed to by Sarah Benjamin, 3652 Carmona Avenue, Apt. #5, Los Angeles, California. During the conversation, HUNTER asked if "Big Ed" had some extras for him. Ed said he would have to call those guys. HUNTER asked if Ed had said there were "a couple hundred" of them. Ed said yes, that it was "easily a couple hundred" or more. Ed said they were charging "14-7." Ed said he had told Mike what he was charging before he went in. HUNTER asked if Ed had said "14-7." Ed said yes.

141. Based on my training and experience, I believe that this was a conversation between HUNTER and a subject named "Big

73

Ed" who was at the stash house.  HUNTER called the stash house to verify inventory and to confirm the price.  "Big Ed" said there at least 200 kilograms of cocaine at the stash house, and that they were selling for $14,700 per kilogram.

142.  On February 12, 1997, at approximately 9:23 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 294-7860.  During the conversation, HUNTER asked what time JACKSON was going to do that.  JACKSON replied he just had to run up there to his friend's house and bring that back down from up there.  JACKSON asked if HUNTER knew what he was saying.  HUNTER replied yes.  JACKSON reiterated he had to run up there and get it, and that in a few minutes he was going to do that before he hit traffic.  HUNTER told JACKSON to snatch one for him.  JACKSON agreed to do so.  HUNTER then asked if JACKSON was alright.  JACKSON replied yes.  HUNTER asked JACKSON again to get one for and he would drop by to pick it up from JACKSON after this jump.

143.  Based on this conversation, I believe HUNTER told JACKSON, a "stash keeper," to pick up a quantity of cocaine for him, and that HUNTER would pick it up later.

144.  On February 14, 1997, at approximately 10:27 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 294-7860.  During the conversation, HUNTER asked to speak to "Tone" (JACKSON).  An U/F put HUNTER on hold.  The U/F was heard calling out the name of "Tony," and that "G" was calling. When "Tony" came to the phone, he said he was leaving around 12:00 or 12:30.  HUNTER said he was going to send GANGSTER over

74

to Tony's location. Tony said okay. HUNTER told Tony to give them a little eyeball. Tony said okay. HUNTER said he would call GANGSTER and send him right now. Tony said okay.

145. Based on this conversation, I believe HUNTER told JACKSON, the stash keeper, to prepare a quantity of cocaine that was to be sold. HUNTER told JACKSON that GANGSTER, a transporter, would be by to pick up the cocaine and for JACKSON to look for him.

146. On February 14, 1997, at approximately 5:09 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 247-1380. AirTouch Cellular lists the subscriber as Anthony Jackson, 3652 Carmona, #5, Los Angeles, California. During the conversation, JACKSON asked HUNTER what was going on. HUNTER replied he was as light as ever. JACKSON asked if GANGSTER (Marcus LNU) had told HUNTER what he said. HUNTER replied no. JACKSON said an U/M was trying to find out how HUNTER was going to do it. HUNTER said he would talk to the U/M in the morning, that he would come by. JACKSON said he would page HUNTER later on this evening. HUNTER agreed.

147. On February 19, 1997, at approximately 6:12 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 247-1380. During the conversation, HUNTER told JACKSON that he had his thing. JACKSON told HUNTER that he had "all three of them."

148. Based on this conversation, I believe HUNTER called JACKSON, the stash keeper, and asked if his cocaine was ready.

JACKSON said he had three kilograms of cocaine ready for pick-up.

149. On February 20, 1997, at approximately 7:53 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 294-7860. During the conversation, HUNTER told Tony (JACKSON) that they were on their way. HUNTER said he had told them to hit Tony, and that it was "four right now." HUNTER said he would get back around for the other one later on. Based on this conversation, I believe that HUNTER called JACKSON to tell him that he had sent a transporter over to pick up four kilograms of cocaine for delivery.

150. A check of California DMV records indicates that JACKSON lists his address as 3652 Carmona, #5, Los Angeles, California.

151. I believe that JACKSON is a "stash keeper" for the HUNTER organization, and that items of evidence are being concealed at his residence. I believe that a search of that location would provide evidence of narcotics trafficking and would assist law enforcement in the investigation into the conspiracy to distribute large quantities of cocaine.

612 South Cochran Avenue, Apartment #308, Los Angeles, California

152. This residence is further described as an apartment within an apartment complex. The building is of pink stucco with white trim. The numbers "612" are affixed to the front of the location. The building is secured. The apartment is on the third floor. The number "308" is affixed to the front door of the apartment.

76

153. On January 15, 1997, at approximately 10:04 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 934-4027, subscribed to by Pamela A. MARTIN, 612 Cochran Ave., Apartment #8, Los Angeles, California. During the conversation, HUNTER asked if "Angelo" was ready. "Angelo" said yes. HUNTER said "they" wanted to exchange "two of them." HUNTER told "Angelo" to bring eight. HUNTER said he would page "Angelo" with 21, so that he could just come up. HUNTER told "Angelo" to make sure that "they" were "flat ones," and said he would "hit" him in 20 minutes. Based on this conversation, I believe that HUNTER told Angelo to bring the money for eight kilograms of cocaine.

154. On January 15, 1997, at approximately 10:29 a.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, HUNTER said he might have some of "that stuff" that "Angelo" liked for 35. "Angelo" said he needed two of "those." "Angelo" asked Hunter to hold one of them for him, and he would buy two when he saw HUNTER.

155. Based on this conversation, I believe that HUNTER told Angelo that he had kilograms of cocaine that he was selling for $13,500 each. Angelo told HUNTER that he wanted a total of three, and would pay for two of them now.

156. On January 16, 1997, at approximately 9:44 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 934-4027. During the conversation, "Angelo" told HUNTER that he wanted 50. "Angelo" asked HUNTER if that was all he had.

77

HUNTER said yes.  HUNTER told Angelo that he had some clean ones and that they were the same thing but [UI].

157. Based on this conversation, I believe that Angelo told HUNTER that he wanted to purchase fifty kilograms of cocaine. HUNTER told Angelo that the cocaine was good.

158. On January 16, 1997, at approximately 10:00 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 934-4027.  During the conversation, "Angelo" told HUNTER that they wanted to purchase two, and that they wanted to look at it first.

159. Based on this conversation, I believe that Angelo told HUNTER that he had a customer who wanted to purchase two kilograms of cocaine. Angelo said the customer wanted to look at them first.

160. On January 16, 1997, at approximately 10:21 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 934-4027. HUNTER told "Angelo" he would be there in a minute.  "Angelo" said it was "612."

161. Based on this conversation, I believe that this was a follow-up call to the call placed approximately 20 minutes earlier on January 16, 1997, where Angelo told HUNTER that he had a customer who wanted two kilograms, but wanted to look at them first.  Angelo said the address was "612" (612 Cochran). I believe HUNTER took the cocaine to that location for the customer to examine.

162. On January 22, 1997, at approximately 9:32 a.m., an

outgoing call was placed from HUNTER's cellular telephone to
(213) 934-4027.  During the conversation, HUNTER asked "Angelo"
if he remembered that "big white lacy thing" from yesterday.
"Angelo" said yes.  HUNTER asked if it was 16.  "Angelo" said it
was 15.

163. Based on this conversation, I believe that HUNTER was
describing a kilogram of cocaine to Angelo. HUNTER asked if he
wanted 16 kilograms, but Angelo said he only wanted 15.

164. On January 22, 1997, at approximately 7:37 p.m., an
outgoing call was placed from HUNTER's cellular telephone to
(213) 934-4027.  During the call, "Angelo" asked if there were
any more of those other ones.  HUNTER said no.  "Angelo" said the
guy wanted to do them at the same thing.  HUNTER said six, then
corrected himself and said seven.  HUNTER said they were clean.

165. Based on this conversation, I believe Angelo wanted to
purchase seven kilograms of cocaine.  HUNTER told Angelo the
cocaine was good.

166. On February 20, 1997, at approximately 11:24 a.m., an
incoming call was received on HUNTER's cellular telephone.
HUNTER asked if "Angelo's" people were alright.  "Angelo" said
no.  HUNTER said he was supposed to hear something in a minute.
"Angelo" told HUNTER to let him know.  "Angelo" told HUNTER
"about 24."

167. Based on this conversation, I believe that HUNTER
called Angelo and asked him if his people had gotten their money
together yet.  Angelo said no. HUNTER said to let him know when

79

they were ready. Angelo told HUNTER that he wanted to purchase about 24 kilograms of cocaine.

168. Based on the above conversations, I believe that "Angelo" is a customer of the HUNTER cocaine organization and that he is actively engaged in sales of cocaine from 612 South Cochran Avenue, Apartment #308, Los Angeles, California. I believe that a search of this residence would provide evidence of narcotics trafficking and would also provide evidence to assist law enforcement in the investigation of the conspiracy to traffic large quantities of cocaine.

## 1929 West 146th Street, #9, Gardena, California

169. This location is further described as an apartment or condominium within an apartment/condominium complex.  The complex is off white colored stucco with brown trim.  The complex has a center driveway.  The number "9" is posted on the east facing garage door.  The number "9" is also posted on the south facing front door of the residence.

170. On February 15, 1997, at approximately 11:36 a.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 515-0706. Pacific Bell lists the subscriber as Tonett McCarns, 1929 West 146th, #9, Gardena, California.  During the conversation, HUNTER asked if he wanted "a whole plate." An U/M said yes, and added that he was going to call HUNTER once he was over there, because he wanted to speak to him personally around 12:30.

171. Based on this conversation, I believe HUNTER asked an

80

UM if he wanted a whole kilogram of cocaine, and the UM said yes.

172. On February 16, 1997, at approximately 3:25 p.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 515-0706. During the conversation, HUNTER said he only had "2-2-9" like he was saying the other day. An U/M said he would be ready for HUNTER tomorrow, the next morning. The U/M said he was just waiting. The U/M said he would take it like that. HUNTER told the U/M to tell the people that "the dinner plate" just cost "42-42." The U/M said that was not a problem. HUNTER said his car phone was having problems, and asked the U/M to page GANGSTER, and to have GANGSTER page HUNTER with a number where he could call him, so that HUNTER could tell GANGSTER what was going on. HUNTER said the pager number was 397-2936.

173. Based on this conversation, I believe that HUNTER told an UM that he had 29 kilograms of cocaine, and that they were selling for $14,200 each.

174. On February 16, 1997, at approximately 3:39 p.m., an outgoing call was placed from HUNTER's cellular telephone to (310) 515-0706. During the conversation, HUNTER asked if that was cool. An U/M asked what HUNTER was talking about. HUNTER said the U/M knew what he was talking about. The U/M asked if HUNTER was talking about what he had told him. HUNTER said yes. The U/M asked if HUNTER was talking about "the whole plate." HUNTER said no, he was talking about those two little separate things, the "mini-mini" [PH]. The U/M said he thought HUNTER was going to do "the plate." HUNTER asked if the U/M wanted

81

"the plate." HUNTER said the "mini-mani" [PH] was going to be "42-42-42." The U/M said that was no problem. HUNTER said what he was saying was that neither [PH] was just 4-4; 4 and 4 like that. HUNTER said it needed to be there, to get well done. HUNTER said it was not well done yet. HUNTER said as far as the dinner plate was concerned, those were different shades.

175. Based on this conversation, I believe that HUNTER told the UM that the cocaine was selling for $14,200 per kilogram. HUNTER agreed to deliver a quantity of cocaine to the UM.

176. Based on these conversations, I believe that the occupants of 1929 W. 146th, #9, Gardena, California, are actively involved in narcotics trafficking. I believe that a search of that location would provide evidence of narcotics trafficking, and would also assist law enforcement in the investigation of suspects involved in this conspiracy to distribute cocaine.

2555 Sixth Avenue, Los Angeles, California

177. This location is further described as a two story multi-unit apartment building, beige stucco with tan wood trim. The apartment building is located on the northwest corner of Sixth Avenue and Adams Boulevard. Each door has its own individual address. 2555 is located on the first level, the second door north. The numbers "2555" are affixed to the door. The doors and windows are barred. There is an alley which runs east to west on the north side of the building where the garages are located.

178. I believe this to be the residence of Thomas MADISON.

82

During the investigation, HUNTER made numerous calls to
(213) 737-5908. Pacific Bell lists the subscriber as Monica
Houlemard, 2555 Sixth Avenue, Los Angeles, California. There were
numerous narcotics trafficking related conversations during the
wire interception.

179. A check of California DMV records revealed that MADISON
lists 2555 Sixth Avenue, Los Angeles, California, as his address.
MADISON also lists this address on DMV automobile registration
paperwork.

180. Based on the intercepted conversations during the wire
interception, I believe that MADISON is actively involved in the
HUNTER cocaine trafficking organization. I believe that a search
of his residence will provide evidence of narcotics trafficking,
and will further assist law enforcement in the investigation into
the conspiracy to distribute large quantities of cocaine.

8725 1/2 Holmes Avenue, Walnut Park, California

181. This location is further described as the rear
structure where two houses are located on one lot. The numbers
"8725" are painted on the west curb of Holmes Avenue. Both
houses have dark brown composite roofs, with dark brown trim, and
cream colored stucco. The front residence has the numbers "8725"
affixed to the east trim. The front door to the residence faces
east, and is a brown colored iron security door. The front
residence also has brown colored iron security bars on all the
windows. The numbers "8725 1/2" are affixed to the southwest
trim of the front residence, since the trim to the rear residence

83

is on the second floor.  The rear residence is two stories, with an attached garage to the south of the residence.  The front door to the rear residence faces south and is a brown colored security door located between two dark brown colored garage doors.

182.  On February 12, 1997, at approximately 6:18 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 581-8197.  Pacific Bell lists the subscriber as Marcus Perkins, 8725 1/2 Holmes Avenue, Los Angeles, California. Investigation has revealed that this residence is located in Walnut Park, an unincorporated area of Los Angeles County, California.  During the call, HUNTER told GANGSTER (Marcus LNU) that he would be there in five minutes.

183.  On February 12, 1997, at approximately 8:59 a.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, GANGSTER asked HUNTER what was up. HUNTER replied he had forgotten how to get there, and asked if he should take Avalon or Central.  GANGSTER said not to take either one, and to just keep coming down Manchester.  HUNTER said he was on Century, but he would just go back to Manchester.  GANGSTER told him to come down Manchester, and as soon as he came under the Metro Rail, through the tunnel, he should make a right at the next light, Holmes Avenue, which was about two to three blocks from the Metro Rail.  HUNTER asked if he should then come straight down Holmes.  GANGSTER replied yes and added that when he went past the stop sign, he would see the driveway.

184.  Based on this conversation, I believe that HUNTER was

84

going to the "stash house" where GANGSTER lived. GANGSTER gave HUNTER directions to his residence on Holmes Avenue.

185. On February 14, 1997, at approximately 4:13 p.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, HUNTER asked what was going on with GANGSTER'S piece. GANGSTER asked where HUNTER was. HUNTER replied he was over by "E" (DORSEY). HUNTER asked if GANGSTER wanted him to tell GANGSTER how to get there. GANGSTER said he was trying to think, because he had to go pick up an U/M's truck from Freddie. HUNTER said he could tell GANGSTER the number. An U/M replied yes, but that "they" thought it would be on Monday. HUNTER asked what "they" were talking about. The U/M replied "they" did not know exactly, adding "they" told "him" that right now it was "35," but they were not black guys, so it had to be better than that. HUNTER laughed and said he was about to tell GANGSTER more, but "35 was too much." HUNTER asked if somebody had "35 right now." GANGSTER replied that was what "they" said about two days ago, so he did not know if "they" still had them. HUNTER said [UI] at 1-4. HUNTER added [UI]. GANGSTER asked if he meant right here. HUNTER replied yes, then added "they" told him it was no lie. HUNTER said he was going to try to get "three," adding, "no cut, no cut." HUNTER said he would let GANGSTER know and asked him to do the same. GANGSTER agreed.

186. Based on this conversation, I believe GANGSTER called HUNTER to tell him he had found a cocaine source and it was going for $13,500 per kilogram. HUNTER laughed and said he was about to

85

tell GANGSTER more, but $13,500 was too much. HUNTER and GANGSTER said they were both going to check around for better prices.

187. On February 16, 1997, at approximately 1:05 a.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 581-8197. During the conversation, HUNTER asked GANGSTER if he still had that change. GANGSTER asked if HUNTER meant his or "Tone's" (Anthony JACKSON's). HUNTER said GANGSTER'S. HUNTER told GANGSTER to be ready and have it ready. GANGSTER asked if he was going with HUNTER. HUNTER said yes.

188. Based on this conversation, I believe HUNTER called GANGSTER at his stash house and told him to have the money he had collected ready, because he was going to come and pick it and GANGSTER up.

189. On February 16, 1997, at approximately 6:09 p.m., an outgoing call was placed from HUNTER's cellular telephone to (213) 581-8197. During the conversation, HUNTER asked GANGSTER if he was ready to go to the hood, and told him he would meet him at 7:30 p.m.

190. On February 17, 1997, an outgoing call was placed from HUNTER's cellular telephone to (213) 581-8197. During the conversation, HUNTER asked GANGSTER if he was ready. GANGSTER said yes. GANGSTER said he would be there in 20 minutes.

191. Based on this conversation, I believe that HUNTER had set up a pre-arranged cocaine delivery with GANGSTER and was telling him to meet in twenty minutes.

192. There were numerous narcotics trafficking related

86

conversations during this investigation between GANGSTER and HUNTER. Based on those and the above-listed conversations, I believe that GANGSTER is working as a cocaine transporter, and also stashes money and cocaine at his residence. I believe that GANGSTER resides at 8725 1/2 Holmes Avenue, Walnut Park, California. I believe that GANGSTER has items concealed at his residence that will provide evidence of narcotics trafficking and will further assist in the investigation involving the conspiracy to distribute large quantities of cocaine.

## 8665 Burton Way, Apartment #419, Los Angeles, California

193. This location is also known as the Deauville Apartments. It is further described as a multi-story apartment complex, constructed of light grey stucco with dark gray trim. The complex is on the north side of the street between Hamel Road and South Willaman Drive. Apartment 419 is on the fourth floor, and is the last apartment on the east side of the building. The numbers "419" are in brass on a black front door.

194. I believe that Rick BLACK resides at 8665 Burton Way, Apartment #419, Los Angeles, California. There were numerous telephone calls previously mentioned in this affidavit between BLACK and HUNTER. I believe that BLACK assists the HUNTER organization by purchasing "load cars" and other vehicles for their personal use. BLACK charges a commission on the cars he purchases for members of the HUNTER organization.

195. BLACK registers the vehicles in whatever name, address and state that members of the HUNTER organization want. During

87

service of the search warrant at DORSEY'S apartment at 7777 West 91st Street, on February 20, 1997, I saw a 1997 Mercedes that had "Black on Black" paper plates on it. The car was parked near DORSEY'S apartment. A search of the vehicle revealed that DORSEY was the owner of the car. Paperwork seized indicated that DORSEY had made a $22,000 cash down payment on the car.

196. There were also bank statements seized inside DORSEY's apartment that had BLACK's name on them. The statements were addressed to 4813 Yellow Pine Lane, Las Vegas, Nevada. This is a residence co-owned by DORSEY and Julius TURRENTINE.

197. On February 21, 1997, TFO Collins served a search warrant on 4813 Yellow Pine Lane, Las Vegas, Nevada. TFO Collins seized paperwork from the Las Vegas residence which also indicated that BLACK lists the 4813 Yellow Pine Lane address on bank records. A customer form addressed to 4813 Yellow Pine Lane, Las Vegas, Nevada was also seized. This form indicated that BLACK had recently purchased a 1997 SC Mercedes.

198. I had previously developed information that Rick BLACK owns a business called "Black on Black Imports." HUNTER placed numerous telephone calls to BLACK at (310) 652-8500. Pacific Bell lists the subscriber as "Black on Black," located at 200 North Robertson Boulevard, #338, Beverly Hills, California.

199. On February 25, 1997, TFO Torres went to 200 North Robertson Boulevard, Beverly Hills, and found a business complex under construction; #338 does not exist. I believe that BLACK probably uses a call forwarding service to have telephone calls

to (310) 652-8500 forwarded to another location.

200. During the investigation, HUNTER also placed numerous telephone calls to (310) 993-8500. L.A. Cellular telephone lists the subscriber as Rick BLACK, 8665 Burton Way, #419, Los Angeles, California. HUNTER also placed numerous telephone calls to (310) 278-8500. Pacific Bell lists the subscriber as Rick BLACK, 8665 Burton Way, #419, Los Angeles, California.

201. On February 25, 1997, TFO Torres went to 8665 Burton Way. He saw a white Ford Tahoe parked near apartment #419. TFO Torres stated the vehicle had "Black on Black" paper plates, and that it was the same vehicle surveillance had seen DORSEY driving on previous occasions. TFO Torres determined that the vehicle identification number for the Ford Tahoe was 1GNEK13R5VJ337191. A check with California DMV records revealed the Ford Tahoe was registered to Tina Pichon and Erik DORSEY, 7777 West 91st Street, Playa Del Rey, California. This is the same location where the search warrant was executed on February 20, 1997.

202. I believe that Rick BLACK has items concealed in his apartment that will provide evidence of his role in this cocaine trafficking organization, and will further assist law enforcement in its investigation of Gerald HUNTER and his associates.

<u>21353 Shakespeare Court, Moreno Valley, California</u>

203. The residence to be searched is further described as a two story single family residence. The residence has a mauve colored stucco exterior with white trim. The numbers "21353" are affixed to the wood trim directly in front of the front door of

the residence.

204. I believe this to be the residence of Jerry Rogers. During the wire interception, there were numerous telephone calls between HUNTER and a subject named "Bone" (aka: Jerry Rogers). Many of the telephone calls were to cellular telephone number (909) 240-2671. AirTouch Cellular listed the subscriber as Frances Davis, 4160 Arlington Avenue, #D-311, Riverside, California. The investigation I conducted revealed that virtually all of the information on this cellular telephone account was false. The address listed is non-existent. Based on my training and experience in narcotics investigations, I know that narcotics traffickers often place telephones in false accounts to avoid police detection and arrest.

205. On January 30, 1997, at approximately 1:50 p.m., an outgoing call was placed from HUNTER's cellular telephone to (909) 240-2671. During the conversation, Rogers asked HUNTER if they could talk. HUNTER said he should probably go to a phone booth. Rogers said the slip did not indicate anything about it being delivered the next day. Rogers told HUNTER that he had been up all night sweating it. Rogers asked HUNTER if he knew anyone at "the Express." HUNTER said no. Rogers said that if they knew someone that person could punch it up, find it and make sure it was coming in. HUNTER asked Rogers if they had someone checking on it. Rogers said they checked and it should be here today before 7:00 p.m. Rogers told HUNTER that it should have been here yesterday. HUNTER said that if he would have known

90

they were going to do it like that, he would have not done it at all. Rogers said he told the guy to put it on the bus. HUNTER told Rogers that he did not want to talk about it any more because he was talking too much. HUNTER told Rogers to go ahead and bring the cars over with their pink slips because he already screwed the whole thing up. HUNTER told Rogers that they should know better than to send it through the mail. HUNTER told Rogers to send whatever they had; 5.0's and all. HUNTER told Rogers to gather whatever he had or else he would give it to them; he is going to lay it down this time. HUNTER said it was not coming out of his pocket this time. Rogers told HUNTER that they could fix it. HUNTER asked Rogers how long would it take to solve the problem. Rogers said it would take them a day or two, if HUNTER gave them a chance to do it. HUNTER told Rogers he would call him back from a phone booth. Rogers said okay.

206. Based on this conversation, I believe that Rogers shipped a quantity of money or cocaine through Federal Express. HUNTER was upset because the shipment was apparently lost.

207. On January 30, 1997, at approximately 2:38 p.m., an outgoing call was placed from HUNTER's cellular telephone to (909) 240-2671. During the conversation, HUNTER asked Rogers if he got it together. Rogers said he was working on it right now. Rogers told HUNTER he was still posted over here; he would wait until the evening. HUNTER told Rogers to come over with the paper. Rogers told HUNTER that he would add whatever they wired him and add everything together. HUNTER said okay. HUNTER asked

91

Rogers if his pager was "4-3-0."

208. Based on this conversation, I believe that this was further discussion between HUNTER and Rogers about the lost shipment. I have also developed information that HUNTER would call pager number (909) 430-7906 when he wanted to contact Rogers.

209. On February 1, 1997, at approximately 12:59 p.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, Rogers said he picked up HUNTER's five, his one, five, five in there, and then he put Douglas' part in there and everything, and wrapped it extra tight. HUNTER said okay. Rogers said he was up at the shop right now, and the guy was supposed to come down from out the way to get the car. Rogers added that he would have that, and then he will send everything else "up there." HUNTER told Rogers just come on with whatever. Rogers said okay, and added that they were going to go from there, and that everything else was tight, and everything was going to come right on up. Rogers said he had it all together now, and that he would take care of it.

210. Based on this conversation, I believe Rogers told HUNTER that he had a shipment of cocaine ready to go, and that he was taking it to a location out of state.

211. On February 6, 1997, at approximately 10:16 a.m., an outgoing call was placed from HUNTER's cellular telephone to (909) 684-7920. Pacific Bell lists the subscriber as Donald Paul, 21353 Shakespeare Court, Moreno Valley, California. During

the conversation, Rogers said he was trying to get the car down there. Rogers said they had put it on the trailer, but that the trailer was swaying too much, and that they could not go faster than 50 miles per hour. Rogers said the guy had turned around and taken the car back, and that the car was still on the trailer. Rogers suggested that he just bring the car down to Inglewood where HUNTER was. HUNTER said he was not trying to put anything up right now. Rogers said he had everything tight, and that they just needed to get started, and it would not stop. Rogers assured HUNTER that it would not stop. HUNTER told Rogers to work what he had, and that he was up against the wall. Rogers repeated that he had it really tight.

212. Based on this conversation, I believe that Rogers was telling HUNTER that the load car was ready to go. On February 6, 1997, Detective Ron Kipp of the Riverside Police Department advised me that he was conducting surveillance in the city of Riverside, when he saw Rogers' 1989 Ford Mustang, California license number 3LLD519, traveling eastbound on the 91 freeway. Detective Kipp said that Rogers was following a truck on the freeway, and that the truck was towing a trailer with a vintage 1963 Chevrolet Impala. Detective Kipp said that the trailer was swaying badly and the truck could go no faster than 45 mph. The truck got off the freeway at 14th Street and Detective Kipp eventually left the surveillance.

213. On February 7, 1997, at approximately 5:00 a.m., I went to 21353 Shakespeare Court, Moreno Valley, California. I saw that

93

Rogers' 1989 For Mustang, California license number 3LLD519, was parked in front of the residence. A registration check revealed the car to be registered in Rogers' name. However, the car was registered to a different address in Riverside. Based on my investigation, I believe Rogers resides at 21353 Shakespeare Court, Moreno Valley, California. I also know that drug traffickers will often register vehicles to addresses other than where they live, to thwart law enforcement's efforts to locate their actual residence.

214. On February 7, 1997, at approximately 9:44 p.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, "Bones" (Jerry Rogers) asked what had happened. HUNTER said they had had a "round table discussion" on "Bones" today. "Bones" said it was not that bad. HUNTER contradicted him and said it was. HUNTER said they said "Bones" would have to go on and take off with what he had. HUNTER said it seemed like "Bones" was just digging a hole, had nothing to cover himself with, and always had to take chances to get something back. HUNTER said he had talked to "Little M" (BLACKWELL) and his people, and that he was trying to convince them. HUNTER said those people had said "Bones" was digging a hole, and were skeptical that something might happen again, and that he would not have anything to work with. HUNTER repeated that he had been trying to convince them. HUNTER said what they said made sense. HUNTER said the guy had even flown in and right back out again, because he did not want to talk over the phone.

94

HUNTER said that was the reason he was calling "Bones" so late.
"Bones" said the way he had gotten it there was the right way,
and that he had told the guy what to do, the guy did it that way,
and that was what had messed everything up. HUNTER said "Bones"
had to be on top of the guy. "Bones" agreed. HUNTER said the
people wanted to see if "Bones" could get his back with that.
"Bones" said he could do that, and show some incentive. Bones
said he could do that, and said he would show HUNTER that he
could, just like how they used to do it with just that one.
"Bones" said he was going to rise right on back up to that 44,
that 44 that he and HUNTER grabbed. HUNTER laughed. "Bones"
said he had everything really tight, and that he had put
everything he had into that. HUNTER said it was Bones' turn to
prove himself. HUNTER said he had his neck out there for
"Bones," and that he still had a chance. "Bones" said he
appreciated that, and said that if HUNTER ever wanted a guy put
in the trunk, he should just let him know, and he would come and
get him. HUNTER laughed. "Bones" said he was not lying, and
would do anything for HUNTER. "Bones" said his "homie" had the
"bacon sealing machine," and asked if HUNTER knew what he was
talking about. HUNTER said yes, and that they had one too.
HUNTER said "Ben" had that. "Bones" said his friend would let
him use it whenever he wanted. HUNTER asked what kind of machine
it was. "Bones" said it was a machine that was used to seal
bacon. "Bones" said that it was really tight, that the guy would
let him use it whenever he wanted, and that he could get one for

95

him when he wanted.  HUNTER asked how much that would cost.
"Bones" said it cost about "20, 22."  HUNTER asked if "Bones"
meant hundred.  "Bones" said yes.  HUNTER said that was too
expensive.  "Bones" said maybe the guy wanted to make a profit
for himself.  HUNTER said he had been working with those, but he
did not think they cost that much.  "Bones" said the machine had
the vacuum suction, and then it sealed it, and it was impossible
to get through that.  "Bones" said he had another thing going,
and that they were going to rise up from there.  HUNTER laughed,
and said "Bones" always came down there drunk, and that was why
they had bad luck.  "Bones" agreed, but said that he had
everything tight now.  "Bones" said he was talking about short
time, every time.  HUNTER said they would see.  "Bones" asked if
they would be ready in the morning.  HUNTER said yes.

215. Based on this conversation, I believe that HUNTER
called a round table meeting to discuss Rogers losing a shipment
in the mail. The leaders of HUNTER's organization were in
attendance. HUNTER said that one of his people even flew in from
out of state for the meeting, and then flew right back out after
the meeting because he didn't want to talk on the telephone.
HUNTER told Rogers that it was decided that he would not be
fronted any more kilograms of cocaine until he paid for the lost
shipment. Rogers was told that he would have to leave with the
one kilogram that he had. Rogers said that he would be able to
bring his drug business back so that he could work back up to
that forty-four kilograms they had done before.  Additionally,

96

Rogers told HUNTER that he would even kill someone to demonstrate his allegiance to HUNTER.  Rogers told HUNTER that he was trying to get cocaine from another source and would rise back up from there.

216. On February 12, 1997, at approximately 8:24 p.m., an incoming call was received on HUNTER's cellular telephone. During the conversation, "Bones" (Jerry Rogers) explained to HUNTER that he had to wait until the morning because his boy went to go get them and put his "head" [PHONETIC] on it.  HUNTER said okay, and told "Bones" to just say a number or something, but not to get into the details.  "Bones" said he had spoken with the guy, the guy was going to hook it up for the morning, but the guy did not know the number yet.  "Bones" said when they holler at the guy, the guy was going to hit him with the number.  HUNTER said okay.  "Bones" then said he had another thing on the line too, so he was supposed to holler at that today, but it looked like it was going to be in the morning also.  HUNTER said okay, and then told "Bones" that he was going to try to get him in and out of the way.  "Bones" said that was cool too.  HUNTER said he would find somebody and they could come down tomorrow.  "Bones" said okay, and added that he would hit HUNTER in the morning. HUNTER said okay.

217. Based on this conversation, I believe that Rogers told HUNTER that he had found another source for cocaine and that he was getting shipment from out of state ready. HUNTER said he was also going to give Rogers an unknown quantity of cocaine to

97

transport.

218. I have spoken many times to FBI Agent Marty Vanderfelt
of the FBI office in Detroit, Michigan. SA Vanderfelt told me
that he is currently investigating an organization headed by a
Jerry Rogers from Riverside, California. He has developed
information that Rogers is shipping kilograms of cocaine from
Riverside, California to Detroit, Michigan. Rogers uses Federal
Express to ship cocaine. SA Vanderfelt said that he had developed
information that Rogers shipped a load of cocaine in a car that
was on a trailer. The car was towed from Riverside, California,
to Detroit, Michigan. SA Vanderfelt said that he had developed
information from surveillance in Riverside, California, that
Rogers is residing at 21353 Shakespeare Court, Moreno Valley,
California. SA Vanderfelt also stated that Rogers drives a
1989 Ford Mustang, California license number 3LLD519. SA
Vanderfelt also said that Rogers' pager number is (909) 430-7906.

218. I have been to 21353 Shakespeare on four separate
occasions within the past four weeks. I went there between the
hours of 5:30 a.m. and 6:00 a.m. I saw Rogers' vehicle parked at
that location on all four occasions. Based on the above
conversations and independent investigation, I believe that
Rogers resides at 21353 Shakespeare Court, Moreno Valley,
California. I believe that a search of that location will

provide evidence of narcotics trafficking and will also further assist law enforcement in the investigation of the HUNTER organization's conspiracy to distribute large quantities of cocaine.

_____
RANDAL HECHT
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed
to before me this _____
day of March, 1997.

# BRIAN QUINN ROBBINS
UNITED STATES MAGISTRATE JUDGE

99